837 F.2d 600
 56 USLW 2432, 92 P.U.R.4th 542
 KENTUCKY WEST VIRGINIA GAS COMPANY, Equitable Gas Company, a
division of Equitable Resources, Inc., American
Gas Association (Amicus Curiae Intervenor),
v.
PENNSYLVANIA PUBLIC UTILITY COMMISSION, Taliaferro, Linda
C., Commissioner, Pa. Public Utility Commission,
Fischl, Frank, Commissioner, Pa. Public
Utility Commission, Shane,
Bill, Commissioner.
Appeal of KENTUCKY WEST VIRGINIA GAS COMPANY and Equitable
Gas Company, a division of Equitable Resources, Inc.
 No. 87-5052.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 7, 1987.
Decided Jan. 19, 1988.
Rehearing and Rehearing In Banc
Denied Feb. 16, 1988.
 
 William A. Mogel (argued), Randall C. Smith, William R. Mapes, Jr., Ross, Marsh & Foster, Washington, D.C., Carroll E. Purdy, Charles E. Thomas, Jr., Thomas & Thomas, Harrisburg, Pa., for appellants.
 Philip McClellan (argued), H. Kay Dailey, Robert P. Haynes, III, Asst. Consumer Advocates, and David M. Barasch, Consumer Advocate, Harrisburg, Pa., for appellee Pennsylvania Office of Consumer Advocate.
 Leroy S. Zimmerman, Atty. Gen., Michael A. Finio, Deputy Atty. Gen., Antitrust Section, Eugene F. Waye, Deputy Atty. Gen., Chief, Antitrust Section, Kathleen Misturak-Gingrich (argued), Office of Atty. Gen., Antitrust Section, Harrisburg, Pa., for appellee Com. of Pa., Office of Atty. Gen.
 David J. Muchow, Gen. Counsel, Eric N. Wise, American Gas Ass'n, Arlington, Va., for amicus curiae American Gas Ass'n.
 Alphonso Arnold, Jr. (argued), Asst. Counsel, John F. Povilaitis, Deputy Chief Counsel, Daniel P. Delaney, Chief Counsel, Pennsylvania Public Utility Com'n, Harrisburg, Pa., for appellee Pennsylvania Public Utility Com'n.
 Jerome M. Feit (argued), Solicitor, Catherine C. Cook, General Counsel, John N. Estes, III and Joanne Leveque, F.E.R.C., Washington, D.C., for appellee F.E.R.C.
 Before SEITZ, MANSMANN and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 This is an appeal from an order of the district court which denied the plaintiff utility company's ("Equitable") request for injunctive and declaratory relief from an Order issued by the defendant Pennsylvania Public Utility Commission ("PUC"), applying Pennsylvania Act of May 31, 1984, No. 1984-74, 66 Pa.C.S.A. Secs. 1307(f), 1317-18 (West Supp.1987), ("Act 74"), a statute enacted regarding utility rate regulation, 650 F.Supp. 659.
 
 
 2
 The principal questions we consider are whether the supremacy clause, the commerce clause, and the due process clause of the United States Constitution prevent a state regulatory agency from determining the prudence of a gas company's choice to buy gas from one source rather than another before permitting the utility a "pass-through" to consumers of the cost of power purchased at wholesale rates approved by the Federal Energy Regulatory Commission ("FERC").
 
 
 3
 We concur with the district court's decision that a facial supremacy clause violation was not proven. Act 74 and the PUC Order implementing its provisions operate in an area exclusively reserved for state regulation; thus, principles of federal pre-emption are not involved. Although the district court did not address expressly the supremacy clause argument that the statute is unconstitutional as applied, we find no constitutional violation in this regard. We also approve the district court's conclusion that the action of the PUC was not in violation of the commerce clause because Act 74's impact upon the flow of interstate commerce is incidental in light of the legitimate local interest of consumer protection. We find no taking of property without due process. We also agree with the district court's determination that the plaintiff's right to counsel has not been abridged by the Order of the PUC. Finally, we decide that the district court did not abuse its discretion in limiting Equitable's request for discovery of communications between certain state agencies and members of the state legislature. We will affirm.I.
 
 The Historical Facts
 
 4
 Equitable Gas, a division of Equitable Resources, Inc., is a Pennsylvania corporation engaged in the production, transportation, storage, distribution and sale of natural gas. The bulk of the gas necessary to serve Equitable's approximately 240,000 residential retail customers in Southwestern Pennsylvania is obtained from three sources, Tennessee Pipeline, Texas Eastern, and Kentucky West Virginia Gas, all interstate pipeline suppliers. Purchases of gas by Equitable from these pipeline sources are governed by tariffs set and approved by FERC. Equitable obtains the remainder of its gas either from its own wells in West Virginia and Pennsylvania or from independent producers.
 
 
 5
 Kentucky West Virginia Gas Company, also a plaintiff herein, ("Kentucky West"), is a wholly owned subsidiary of Equitable Resources, Inc. and sells to Equitable approximately 70% of the gas it produces.
 
 
 6
 On July 30, 1984, the Pennsylvania legislature enacted Act 74, dictating the mechanism by which natural gas distribution companies must establish retail rates for sales of gas to Pennsylvania consumers. Act 74 guidelines applicable to Equitable provide: "Natural gas distributors with gross intrastate operating revenues in excess of 40 million dollars may file tariffs reflecting increases or decreases in natural gas costs ..., but no such natural gas utilities shall voluntarily file more than one such tariff in a twelve month period...." Sec. 1307(f)(1).
 
 
 7
 Once a tariff is filed, the PUC is then authorized to conduct an investigation to determine the reasonableness of the proposed rates. Secs. 1307(f)(2), 1318. A proposed tariff will not become effective nor will it be deemed "just and reasonable" unless the PUC determines that the utility is pursuing a "least cost fuel procurement policy" consistent with its obligation to provide safe, adequate, and reliable service to its customers.[1] Sec. 1318(a). Particularly applicable to the Equitable-Kentucky West situation is the statutory direction that, if a utility purchases all or part of its natural gas from an affiliated interest, the PUC is required to make the following specific findings regarding the justness and reasonableness of gas purchases from the affiliate:
 
 
 8
 (1) That the utility has fully and vigorously attempted to obtain less costly gas supplies on both short-term and long-term bases from nonaffiliated interests.
 
 
 9
 (2) That each contract for the purchase of gas from its affiliated interest is consistent with a least cost fuel procurement policy.
 
 
 10
 (3) That neither the utility nor its affiliated interest has withheld from the market any gas supplies which should have been utilized as part of a least cost fuel procurement policy.
 
 
 11
 Sec. 1318(b).
 
 
 12
 Finally, when the PUC seeks to render a "just and reasonable" determination under Act 74, Sec. 1318(d) cautions that the fact that a FERC-approved contract or rate has been established for interstate purposes will not serve as per se satisfaction of the utility's burden of proof that the gas prices and volumes associated with FERC approval are just and reasonable for purposes of evaluating if a least cost fuel procurement policy has been followed.
 
 
 13
 On March 1, 1985, in conformity with Sec. 1307(f) of Act 74, Equitable filed its "Annual Purchase Gas Adjustment" for the period of July 1983 through June 1984 in which it proposed a rate increase based upon wholesale costs incurred when procuring natural gas from its suppliers.
 
 
 14
 In response to Equitable's proposal of retail rates, the PUC initiated its Act 74 compliance inquiry, i.e., whether Equitable had demonstrated pursuit of a least cost fuel procurement policy in obtaining the wholesale gas.
 
 
 15
 After a hearing by an Administrative Law Judge, the PUC found that Equitable had purchased gas from its affiliate, Kentucky West, when less expensive gas had been available from other sources and concluded that Equitable had not met its Pennsylvania statutory "just and reasonable" burden evidencing compliance with a least cost fuel procurement policy. Accordingly, the PUC denied Equitable the opportunity to pass through to consumers approximately $14.3 million of Equitable's proposed rate increase, reflecting the amount paid for gas which the PUC found Equitable had imprudently overpaid for the gas purchased from Kentucky West. The PUC ordered additionally that Equitable employ counsel separate and independent from Kentucky West in future proceedings before FERC. Equitable sought review of this PUC Order before the Commonwealth Court of Pennsylvania.[2]
 
 
 16
 Equitable and Kentucky West also filed suit in federal district court challenging the constitutionality of Act 74. Equitable sought to enjoin the Commission from inquiring into its purchasing choices of natural gas from among competing gas suppliers. The rationale for this request was that FERC had approved the price of Kentucky West gas as "just and reasonable"[3] for purposes of federal law, and, therefore, the PUC did not possess the authority to disregard the federal approval in the state rate-setting proceeding. Equitable also sought a declaratory judgment that Act 74, enabling the PUC to disallow Equitable's purchased gas costs, was unconstitutional in light of the supremacy and commerce clauses and also that the PUC's Order represented an infringement upon other constitutionally-guaranteed rights.
 
 
 17
 A hearing on the appropriateness of preliminary injunctive relief was held, but the district court chose to abstain from exercising its jurisdiction. We reversed that determination, 791 F.2d 1111 (3d Cir.1986), and remanded the case to the district court for disposition on the merits. In December of 1986, after a hearing, the district court entered judgment in favor of the defendants. The district court found no constitutional violation in Act 74 on its face but did not address the argument that Act 74 was unconstitutional as applied to Equitable and Kentucky West by the PUC Order. The court also left unanswered the question of whether the PUC Order would abridge the plaintiffs' right to counsel in future proceedings before FERC, impliedly finding that the issue was not ripe for judicial disposition. This appeal followed.[4] On May 20, 1987, before argument of this appeal, the Pennsylvania Commonwealth Court rendered its decision affirming the PUC Order.
 
 
 18
 On appeal, Kentucky West and Equitable argue that Act 74 violates the supremacy clause of the United States Constitution. They argue that, because of pervasive federal regulation of wholesale pricing in the natural gas industry, Pennsylvania has no authority to compel Equitable to select the least expensive fuel available to it but must permit the utility to recover wholesale costs incurred at filed tariff rates. Equitable also argues that Act 74 is unconstitutional as applied by the PUC Order because it ignores Equitable's unavoidable, federally-approved, minimum bill obligation to Kentucky West. Equitable asserts that Pennsylvania's protection of its local interests, by permitting a pass-through only of the cost of the lowest priced gas, will indirectly and impermissibly affect the price of gas in other states in violation of the commerce clause. Equitable also alleges that the retroactive nature of the PUC's Order is a taking of property without due process. The plaintiffs also renew their contention that the PUC Order violates its right to counsel of their choice. Finally, the plaintiffs object to an order of the district court limiting the scope of their discovery of communications by members of the Pennsylvania legislature regarding their purpose in enacting Act 74.
 
 
 19
 Our review of the district court's findings of fact is governed by the clearly erroneous standard, while the conclusions of law based upon these facts are subject to our plenary review. The district court's decision limiting the content of Equitable's discovery involves an exercise of discretion and our review is then confined to whether there has been an abuse of that discretion. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 II.
 A. Preemption Generally
 
 20
 We begin with Equitable's contention that the preemptive effect of the supremacy clause and the restraint of the commerce clause prevent a state regulatory agency from inquiring into the prudence of Equitable's choices among suppliers of gas. We preface our analysis of Equitable's arguments by outlining fundamental principles of preemption generally and as applied to retail and wholesale ratemaking.
 
 
 21
 The supremacy clause invalidates all state laws that conflict or interfere with an act of Congress.[5] Rose v. Arkansas State Police, --- U.S. ----, 107 S.Ct. 334, 93 L.Ed.2d 183 (1986). Administrative regulations promulgated pursuant to Congressional authorization have the same preemptive effect as federal statutes. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).
 
 
 22
 Under the supremacy clause, federal law may preempt state law in any of three ways; first, when in enacting federal law, Congress explicitly defines the extent to which it intends to preempt state law; second, when even in the absence of express preemptive language, Congress indicates an intent to occupy an entire field of regulation and has left no room for states to supplement the federal law; and, finally, when compliance with both state and federal law is impossible or when state law stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress. Michigan Canners and Freezers Association, Inc. v. Agricultural Marketing and Bargaining Board, 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); Capital Cities Cable, Inc. v. Crisp, id.
 
 
 23
 Even in the absence of preemptive legislation, the commerce clause bars state regulation that unduly burdens interstate commerce. The commerce clause acts as an implied restraint on state regulatory powers, which must give way before the superior authority of Congress to legislate on, or leave unregulated, matters involving interstate commerce. United Building and Construction Trades Council of Camden County and Vicinity v. Mayor and Council of City of Camden, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984).
 
 
 24
 Prior to the enactment of the Natural Gas Act, 15 U.S.C. Sec. 717, et seq. (1934) ("NGA") and the Federal Power Act, 16 U.S.C. Sec. 791a et seq. (1935) ("FPA"), a series of decisions by the Supreme Court concerning the commerce clause outlined those areas of the utility industry in which the states were precluded from exercising regulatory authority. Congress subsequently expressed concern over the absence of state authority in wholesale sales when it became apparent that exploitative wholesale rates were being passed through to retail customers in the form of retail rates. Arkansas Electric Coop. v. Arkansas Public Service Commission, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). To close this gap in regulatory control, Congress enacted legislation tailored to supplement, not limit, the reach of state regulation. Federal Power Commission v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949).
 
 
 25
 In Montana-Dakota Utilities, Co. v. Northwestern Public Service Company, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), the Supreme Court established what has since become known as the filed rate doctrine, i.e., the rate filed with and approved by the Federal Power Commission (FERC's predecessor), is the only legitimate rate. The purchaser's right to a reasonable wholesale rate is the right to the rate which the Commission files or fixes. Except for a narrow review of the Commission's orders, the court can assure no right to a different rate on the ground that, in its opinion, another rate is the only or more reasonable one. Thereafter, in Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), the doctrine was transformed into a rule of preemption under which state courts must recognize the inviolability of wholesale rates on file with or approved by FERC. Most recently, the Supreme Court in Nantahala Power & Light Company v. Thornburg, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986), set the current parameters of the filed rate doctrine by affirming a line of state court cases, exemplified by Narragansett Electric Company v. Burke, 119 R.I. 559, 381 A.2d 1358 (1977), cert. denied, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978), which held that state regulatory commissions must allow a retailer to recover at retail rates the cost incurred as a result of paying the FERC-determined wholesale price. Under these principles, states are preempted from questioning or altering the wholesale rates set by FERC. Hobelman, The Narragansett Decision and Its Aftermath, 6 Energy L.J. 33 (1985).
 
 B. The Supremacy Clause
 
 26
 Given supremacy clause considerations, Equitable challenges the constitutionality of Act 74 both facially and as applied. Equitable alleges first that Act 74 and the PUC's Order enforcing it are preempted by the all-encompassing federal regulation of the natural gas industry.
 
 
 27
 Equitable does not challenge the Commonwealth's authority to set retail rates for intrastate suppliers. It argues that Congress' regulation of wholesale rates is exclusive and that Act 74, under the guise of regulating the local distribution, intrudes upon that jurisdiction by indirectly affecting wholesale natural gas rates.
 
 Section 1318(d) of Act 74 provides:
 
 28
 The fact that a contract or rate has been approved by a Federal regulatory agency for interstate ratemaking purposes shall not, in and of itself, be adequate to satisfy the utility's burden of proof that gas prices and volumes associated with such contract or rate are just and reasonable for purposes of this section.
 
 
 29
 Equitable argues primarily that Sec. 1318(d) of Act 74 is unconstitutional because it permits the PUC to disregard a lawful rate for interstate natural gas sales previously determined to be just and reasonable by FERC pursuant to its rate-setting authority established by federal statutes, the NGA, and the Natural Gas Policy Act, 15 U.S.C. Sec. 3301, et seq. (1978), ("NGPA"). Equitable claims that, by its plain language, Sec. 1318(d) violates the filed rate doctrine and unlawfully intrudes into the wholesale rate-making function exclusively within the jurisdiction of the federal government. It further alleges that the PUC Order applying Act 74 far exceeded Pennsylvania's jurisdiction over intrastate distribution and that the effect of denying the $14.3 million pass-through unlawfully invaded the wholesale natural gas rate-making function, exclusively vested in the federal government. Equitable argues that the amount disallowed was incurred pursuant to the filed rate of its interstate pipeline supplier and prices established by the NGPA.
 
 
 30
 To the contrary, the PUC argues that preemption cannot be invoked because Sec. 1318(d) is not an unconstitutional intrusion into the occupied field. It agrees that Sec. 1318(d) does not permit the PUC to alter the filed rate, but asserts that it allows the PUC to compare actual gas purchases to available alternatives. The PUC challenges the applicability of the Narragansett doctrine here. Interpreting Narragansett to establish that a state authority has no jurisdiction to inquire into the reasonableness of the wholesale rate, the PUC counters that it did not alter, change, amend or review the reasonableness of any wholesale filed rate; rather, it only reviewed whether Equitable's choice among available wholesale rates demonstrated pursuit of a least cost policy. In the PUC's view, Sec. 1318(d) does not permit it to analyze whether the wholesale rate itself is reasonable; Sec. 1318(d) only allows a determination as to whether purchases are reasonable. If the volumes purchased were unreasonable in light of available alternatives, Act 74 forbids the excessive costs to be borne by Pennsylvania rate payers. The PUC thereby concludes that its inquiry does not invade or threaten federal jurisdiction because it does not affect the wholesale filed rate.
 
 
 31
 Both sides cite the recent Supreme Court decision in Nantahala Power & Light Company v. Thornburg, id., as support for their respective positions. In Nantahala, FERC was required to determine the state utility's entitlement to power and the Supreme Court determined that the North Carolina State Commission had overstepped its regulatory authority when it attempted to change that designated amount.
 
 
 32
 Equitable's interpretation of Nantahala is that it prohibits a state commission from penalizing a utility for purchasing gas at federally-approved rates during a prior period.
 
 
 33
 Equitable cites Nantahala as further support for the theory that a state may not directly or indirectly disallow the pass-through of FERC-approved purchased gas costs in the exercise of the regulation of local distribution. Equitable quotes from Nantahala:
 
 
 34
 Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A state must rather give effect to Congress's desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority.
 
 
 35
 Id. 106 S.Ct. at 2357.
 
 
 36
 The PUC interprets Nantahala to mean only that a state regulatory body is powerless to change a FERC determination that a state-regulated utility is entitled to a certain specified percentage of interstate-generated (and FERC-regulated) power. The PUC cites the following language as foreshadowing the case now before us and as indicative of how the Supreme Court would rule on the precise issue:
 
 
 37
 Without deciding this issue, we may assume that a particular quantity of power procured by a utility from a particular source could be deemed unreasonably excessive if lower-cost power is available elsewhere, even though the higher-cost power actually purchased is obtained at a FERC-approved, and therefore reasonable price.
 
 Id. at 2360. (Emphasis in original.)
 
 38
 The PUC concludes that Sec. 1318(d) only states that purchasing any quantity of natural gas at a FERC-approved rate is not in and of itself proof that the total amount paid was not unreasonably excessive, when compared to available alternatives. The PUC acknowledges that Nantahala does not settle the issue, but asserts that the quoted dicta implicitly condones Act 74's overseeing of intrastate activity.
 
 
 39
 In its analysis of the facial constitutional challenge of Act 74 based upon the supremacy clause, the district court noted the dilemma of maintaining the proper balance between federal and state authority in the regulation of utilities and how this dichotomy of interests has presented a serious challenge to both judicial and Congressional wisdom. Arkansas Electric, id. The district court concluded, however, that Act 74 does not expressly conflict with the NGA because Act 74 purports on its face to operate only in an area which Congress has not preempted but, to the contrary, has expressly reserved to state control. The court noted that the statute explicitly reiterates a long-standing maxim of utility regulation jurisprudence, i.e., that states may legitimately exercise authority over intrastate utility rates. The court found that the statute and the PUC's Order lawfully focused upon the interstate retailer's purchasing options as they impacted upon intrastate rates and concluded that the Pennsylvania statutory scheme fell within that category of regulatory questions reserved for the states and in accordance with the federal interest in insuring low prices for consumers.
 
 
 40
 The district court also held that preemption could not be inferred from an overall scheme of federal regulation. The court found that FERC jurisdiction does not comprehensively govern the field of utility regulation, rather, it complements the Commonwealth's control of the utility. The court likewise determined that federal interest in the area could not be classified as dominant, given the historical right of the states to exercise police power over utilities. In addition, the court found no physical impossibility in compliance with both the federal and the state regulations.
 
 
 41
 The district court concluded that the PUC's least cost policy review was not preempted because FERC's considerations are limited to whether a seller is charging a just and reasonable wholesale rate based upon its cost of service. FERC does not take the further step and decide whether that rate was the lowest available to a given purchaser.
 
 
 42
 We agree with the district court that FERC's rate-making determination does not govern the entire wholesale transaction. In regard to preemption by the NGA, we perceive no conflict of regulatory authority. While it is true that the NGA does not expressly preclude FERC from regulating the entire spectrum of a wholesale transaction, exclusive regulation is not the declared intent of the statute. Indeed, retail sales are specifically excluded from federal regulation by 15 U.S.C. Sec. 717(b), and, accordingly, companies engaging only in retail sales are also necessarily excluded from regional regulation. Thus, we perceive significant support for the authority of states to review the prudence of a retailer's gas purchasing decision. The legislative history of the NGA confirms that the NGA was not intended to regulate the natural gas industry comprehensively. H.Rep. 709, 75th Cong., 1st Sess. (1937); Interstate Natural Gas Co., Inc. v. Federal Power Commission, 331 U.S. 682, 690, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947).
 
 
 43
 Regarding the states' traditional power to consider the prudence of a retailer's purchasing decision in setting retail rates, we find no reason why utilities must be permitted to recover costs that are imprudently incurred; those should be borne by the stockholders, not the rate payers. Although Nantahala underscores that a state cannot independently pass upon the reasonableness of a wholesale rate on file with FERC, it in no way undermines the long-standing notion that a state commission may legitimately inquire into whether the retailer prudently chose to pay the FERC-approved wholesale rate of one source, as opposed to the lower rate of another source.
 
 
 44
 We interpret Nantahala as preempting state commissions from questioning or altering the wholesale rate and compelling them to accept it when determining pass-through in their retail rate-setting procedures. In this way, the filed rate doctrine measures whether local retail rate-making activity interferes with federal authority over wholesale rates. Therefore, where a state commission violates the filed rate doctrine, this equates to an unlawful interference with federal authority over the same activity. Id. 106 S.Ct. at 2356.
 
 
 45
 Nonetheless, while Nantahala affirms that the PUC must accept the reasonableness of wholesale rates paid by a retailer, that does not end the inquiry or decide the issue in this case. The basic question before us is whether the PUC, without impugning the reasonableness of the wholesale rate, could consider whether Equitable prudently decided to incur the purchased gas cost from Kentucky West, even if procured at a FERC-approved rate.
 
 
 46
 We note that FERC's interpretation of its statutory authority[6] recognizes that wholesale rate-making does not as a general matter determine whether a purchaser has prudently chosen from among available supply options. FERC is called upon to pass upon the justness and reasonableness of wholesale rates and wholesale transactions, not whether a retailer acted prudently in making the purchase. If a distributor buys gas at wholesale and then sells it at retail, the state, not FERC, sets the rate for that second sale. In evaluating that retail rate under Sec. 1318, the state should not be forestalled from considering the prudence of the distributor's purchased gas costs in establishing the cost of retail service. Since the question here of whether the retailer acted with economic prudence in purchasing from one wholesaler rather than another is never before FERC, the PUC is not regulating the same activity. Consequently we find no conflict between FERC's authority and that granted to the PUC on the face of Act 74.
 
 
 47
 We caution, however, that our rationale concerning the PUC's rate-setting authority should not be construed as finding that its regulatory jurisdiction is without limitation. An otherwise valid state law may not be applied in such a way as to interfere with a federal regulatory scheme. Equitable has also advanced an "as applied" constitutional challenge to Act 74 based upon the supremacy clause. The gravamen of its complaint in this regard is that the $14.3 million disallowance represented fixed and unavoidable costs incurred by the company. This characterization is premised upon Equitable's contention that it incurred these gas-purchasing costs pursuant to its minimum bill contractual obligation with Kentucky West.[7]
 
 
 48
 Equitable claims that the PUC decided that Equitable should not have purchased gas from Kentucky West in favor of less expensive supplies without regard to the fact that Equitable would have had to pay for the gas in any event under the minimum bill contract. If that were in fact the case, we would not readily dismiss Equitable's theory of preemption. What is troubling are the facts, or more precisely, the absence of facts indicating that the specifics of this minimum bill obligation issue were properly presented to and adjudicated before the district court.
 
 
 49
 In its brief submitted to this court, Equitable advances the theory, indeed, centralizes the "as applied" constitutional argument, on its interpretation that the $14.3 million disallowed represented unavoidable costs since that amount was contractually due and owing to Kentucky West under its minimum bill contract.
 
 
 50
 The Office of Consumer Advocate ("OCA"), intervenor defendant, strongly challenged the foundation of this argument alleging that it represented both a factual misstatement and a legal mischaracterization. The OCA counters that the $14.3 million adjustment was unrelated to the minimum bill obligation.
 
 
 51
 The PUC likewise questioned the integrity of Equitable's characterization of the $14.3 million. After the briefs were filed, the PUC presented a motion to strike those portions of Equitable's brief which defined the $14.3 million as an unavoidable minimum bill obligation. The PUC claimed that Equitable was raising this argument as a theory for relief for the first time on appeal and never argued this minimum bill question before either the PUC or the district court. The PUC further claims that this new theory represents a backdoor attempt to relitigate the PUC factfinding, a violation of the preclusive effect accorded by federal courts to factfinding of state agencies acting in their judicial capacity.
 
 
 52
 Equitable responded to the motion by strenuously arguing that characterization of the $14.3 million as a portion of their minimum bill obligation had been consistently and repeatedly set forth as the basis for their challenge of the PUC Order in all proceedings and requested a remand to present evidence probative of this claim.
 
 
 53
 In considering these statements of position and accompanying arguments, we first find that it was essential for Equitable to prove its theory, on the "ground floor," that the PUC's $14.3 million disallowance failed to take into account its minimum bill liability to Kentucky West since this is the only logical basis to support its "as applied" constitutional challenge to Act 74.
 
 
 54
 The district court disposed of Equitable's argument and the PUC's responsive contention that this theory equated to an attempt to relitigate the PUC's factfinding, by declining to inquire into the correctness of the PUC's activity in this matter. The rationale for this summary disposition was that the propriety of the utility commission's findings was not relevant to the district court's perception of the question before it--that being a challenge to the core authority of the PUC to engage in the factfinding mission and not a challenge to the result of that expedition.
 
 
 55
 In conformity with our power of plenary review, we undertook a time-consuming analysis of the proceedings below to ascertain whether Equitable had raised the question of its minimum bill obligation in the context now developed on appeal. We conclude that Equitable failed to provide an analytic framework supporting an argument that the $14.3 million disallowance represented an unavoidable FERC-approved contractual obligation. The record simply does not demonstrate that any portion of the disallowed costs represented Equitable's minimum bill obligation.
 
 
 56
 The PUC found that, on June 30, 1983, Equitable invoked the force majeure clause in Kentucky West's tariff, reducing purchases to below minimum bill levels and announcing that it would pay only for gas taken. The PUC found that, for the period in question, Equitable had made no minimum bill payments to Kentucky West but had been pursuing settlement discussions in an attempt to reduce its minimum bill liability. At the time of the ratemaking under consideration here, no settlement agreement had been submitted to FERC for approval. The PUC found that no minimum bill costs had ever actually been incurred, and therefore declined to take them into consideration in setting the retail rate for the period in question. This uncertainty as to what minimum bill costs, if any, would ever be incurred by Equitable also justified the PUC's refusal to consider minimum bill liability in evaluating whether Equitable had pursued a least cost fuel procurement policy for the twelve month period under examination.
 
 
 57
 When a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency factfinding the same preclusive effect to which it would be entitled in the state's courts. University of Tennessee v. Elliott, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). To the extent that it is supported by substantial evidence, the PUC's factfinding is given preclusive effect in the Pennsylvania courts. Metropolitan Edison Company v. Pennsylvania Public Utility Commission, 62 Pa.Commw. 460, 437 A.2d 76 (1981). Equitable prosecuted its PUC factfinding claim before the Commonwealth Court of Pennsylvania. On May 20, 1987, the Commonwealth Court affirmed the Order of the PUC:
 
 
 58
 Here, the PUC reviewed the evidence and concluded that the gas costs were excessive and imprudently incurred. That conclusion was based on testimony indicating the known availability of less expensive gas which could have been taken in lieu of more expensive gas from Equitable's affiliate, Kentucky West. These findings are supported by substantial evidence, therefore we will not substitute our judgment for that of the PUC.
 
 
 59
 Equitable Gas Company v. Pennsylvania Public Utility Commission, --- Pa.Commw. ----, 526 A.2d 823, 831-32 (1987). We, therefore, give the PUC's factfinding preclusive effect.
 
 
 60
 In the district court Equitable did not challenge the evidentiary support for the PUC's findings. Instead, Equitable's witnesses merely testified before the district court that Equitable would have incurred "huge" minimum bill liability had the alternate supplies been purchased. However, Equitable did not offer any evidence to quantify this obligation. No mathematical figures were presented establishing what actual costs Equitable had incurred or would incur due to its minimum bill liability to Kentucky West, if it had purchased the gas from other suppliers in conformity with the PUC Order. Nor were any figures presented to indicate how minimum bill obligations related to the purchased gas disallowed by the PUC. We find that establishment of these facts would be essential to support Equitable's claim of unlawful disallowance of a FERC-approved obligation.[8] The absence of any quantification leads us to conclude that Equitable failed to advance this theory for recovery at trial.
 
 
 61
 Accordingly, we find that the district court did not err in concluding that no supremacy clause violation occurred.
 
 C. The Commerce Clause
 
 62
 The commerce clause,[9] empowering Congress to regulate commerce among the states, is a prolific source of competition between state and federal legislation. Certain areas of commerce have escaped potential federal regulation due primarily to their local character. South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 185, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938). States have traditionally been permitted to exercise local control provided that they act within commerce clause-imposed restraints, and in, as a necessary adjunct, the absence of federal regulation to the contrary. Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978).
 
 
 63
 The limits of states' authority over matters of commerce have evolved from a series of Supreme Court decisions. The thread of concern running through these cases is the peril of state activity resulting in local economic protectionism. This danger was expressed by the Supreme Court in H.P. Hood & Sons, Inc. v. DuMond, 336 U.S. 525, 537-38, 69 S.Ct. 657, 664-65, 93 L.Ed. 865 (1949):
 
 
 64
 This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. As the Court said in Baldwin v. Seelig, 294 U.S. 511, 527 [55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935) ], "what is ultimate is the principle that one state in its dealing with another may not place itself in a position of economic isolation."
 
 
 65
 The concern emerged into a per se rule of invalidity when state legislation was determined to encompass a defined goal of economic protectionism. City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). An exemplification of legislation evidencing such an isolationist intent is a state law which patently subverts the flow of interstate commerce at its borders. See, Welton v. Missouri, 91 U.S. (1 Otto) 275, 23 L.Ed. 347 (1876).
 
 
 66
 Balancing factors do, however, exist. If credible objectives are advanced by local legislation and there is no overt discrimination against interstate trade, state commerce laws may survive commerce clause scrutiny. In these instances, the Court has fashioned a more flexible evaluation of state legislation, the general contours of which are outlined in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), and reiterated in Philadelphia v. New Jersey:
 
 
 67
 Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."
 
 
 68
 Id. 437 U.S. at 624, 98 S.Ct. at 2535.
 
 
 69
 Equitable opines that Act 74 does not legislate over a legitimate local interest and argues to the contrary that the statute and the PUC Order applying its provisions constructed a wall against the interstate flow of natural gas. It characterizes Act 74 as protectionist in nature, subject to the "per se rule of invalidity." Equitable submits excerpts from the legislative history of the Pennsylvania statute and concludes that certain statements reveal unlawful local protectionism as its purpose. Equitable quotes the following statements of various legislators as evidence:
 
 
 70
 Let us look at the possibility that this bill creates and the incentive it creates for those companies to drill in the State of Pennsylvania.
 
 
 71
 * * *
 
 
 72
 * * *
 
 
 73
 Pennsylvania ... has a considerable amount of gas underground that can be found, and it can be found at a much lower price than what they are talking about in the Gulf of Mexico and the transportation costs that are added to it ... and this legislation reaches out to [interstate] pipelines. It reaches out to the transmission companies.
 
 
 74
 Pa.Legis.J.House at 1973 (Dec. 5, 1983). Another representative stated:
 
 
 75
 If this bill passes, the utility companies are going to be under greater pressure to buy that Pennsylvania shut-in gas, which is going to be a good deal for Pennsylvania consumers as well as a good deal for the Pennsylvania oil and gas fields.
 
 
 76
 Pa.Legis.J.House at 1972 (Dec. 5, 1983).
 
 
 77
 Equitable construes these expressions as demonstrative of a discriminatory objective of benefitting Pennsylvania gas production while paying no heed to the federally-approved system of interstate natural gas pricing. Equitable argues that neither the proclaimed motive of protecting state consumers nor stimulation of in-state gas production can withstand commerce clause evaluation in light of the overall discriminatory tone of the Act.
 
 
 78
 To demonstrate uneven effects of Act 74, Equitable points to a series of alleged illegalities accomplished through application of the PUC Order. First, Equitable claims that segments of the PUC Order, reducing Equitable's purchases from Tennessee Gas, affects Tennessee's customers in 21 other states and consequently causes operational problems on the Tennessee system. Equitable asserts that these problems occur as a direct result of its reduction of purchases from the Tennessee system, because the increased costs on Tennessee's system are then allocated to its customers in other states. Equitable also contends that the PUC Order creates difficulties for Tennessee in acquiring new gas reserves. Equitable likewise claims that its pipeline supplier, Texas Eastern, will incur problems similar to Tennessee due to the PUC-mandated cutback of purchases from the Texas Eastern line.
 
 
 79
 Affiliate Kentucky West is claimed to be similarly affected by the PUC's application of Act 74 as it shifts fixed costs away from Pennsylvania consumers to Kentucky West's customers in other states. Equitable asserts that the Order creates potential operational problems for Kentucky West, a result highly unacceptable as Kentucky West is not subject to PUC jurisdiction. Equitable urges us to consider that any significant reduction in Equitable's purchases compelled by the PUC jeopardizes Kentucky West's service to its small municipal customers in Eastern Kentucky. This supposedly occurs because the Order's mandate to cut back affiliate purchases necessarily will reduce Kentucky West's takes from local producers in Virginia and Kentucky, potentially causing well shuttings, reservoir damage and potential loss of producing acreage. Equitable claims that minimizing Equitable's purchases from Kentucky West could impose serious cash flow problems that could jeopardize its interstate operations.
 
 
 80
 Finally on this issue, Equitable argues that in calculating the availability of alternate sources of gas the PUC Order imputed non-existent volumes on a cost-free basis which in fact did not exist. Using these volumes to justify the shift of purchasing away from Kentucky West, Equitable asserts, represents a blatant effectuation of unlawful economic protectionism.
 
 
 81
 As a corollary argument, stressing its analysis of the goal of the commerce clause as rescuing commerce from destructive consequences which result from conflicting legislation from many different states, Equitable claims it has suffered a "balkanization"[10] result. Equitable avers that a domino-effect situation has been manifested and points out that both the Pennsylvania PUC and the West Virginia Public Service Commission have reviewed their purchases for this relevant time period and arrived at two different conclusions. This, it alleges, exemplifies its exposure to different rulings from different jurisdictions which has already led to inequitable results.
 
 
 82
 In response to Equitable's avowal of a constitutional violation of the commerce clause, the PUC cites Pike v. Bruce Church, id., referred to with approval in Arkansas Electric Coop. v. Arkansas Public Service Commission, id., as the appropriate standard for commerce clause analysis in this case. The PUC claims that the "legitimate local public interest" language of Pike v. Bruce Church contemplates matters involving the general welfare of state citizens and that utility regulation is traditionally a proper subject for state regulation pursuant to the police power. The PUC then asserts that Arkansas Electric exemplifies its position that this authority to regulate utilities includes the power to regulate the intrastate retail sale of natural gas. Thus it argues that Act 74 is in conformity with the defined limits of the commerce clause in that the function of Sec. 1318 is to permit the PUC to determine if volumes purchased at a particular rate were reasonable in light of available and competing alternatives, even after FERC has established that the interstate rate was just and reasonable. The PUC then concludes that part one of the Pike v. Bruce Church equation has been satisfied in that Act 74 effectuates a legitimate local concern in setting affordable retail natural gas rates, a concern of the ultimate consumer, compatible with the concerns of federal legislation.
 
 
 83
 In regard to the second prong of the Pike v. Bruce Church test, the PUC claims that the burden imposed on interstate commerce is minimal. It avers that Act 74 only regulates sales from Equitable to its Pennsylvania customers albeit through a process which necessarily involves review of Equitable's wholesale purchase but solely for the aim of effectively regulating Equitable's retail sales. The PUC asserts that the only impact Act 74 has on interstate commerce is to stimulate a vigorous interstate market. In further support, the Commission opines that in the absence of Act 74 utilities would be free to purchase at a FERC-approved price, irrespective of the effect on retail rates. By way of illustration the PUC claims that Equitable could purchase gas ignorant of lower price competing alternatives, secure in the knowledge that the PUC would be compelled to rubberstamp proposed retail rates to the extent they are in accord with FERC rates. This blind approval could result, it submits, merely because the proposed Equitable rate was identical to the FERC rate and despite the fact that FERC does not establish the intrastate retail rates. In essence, Equitable could assume that its wholesale choices were thoroughly unreviewable by state regulators. The PUC believes this position implicitly grants FERC substantial retail rate-making influence not contemplated by the NGA or the NGPA, all in an attempt to bypass traditional areas of state regulation.
 
 
 84
 In conclusion the PUC asserts that because Act 74 neither directly nor indirectly seeks to regulate any gas transaction in interstate commerce, and because the statute actually encourages competitive interstate gas markets, it poses no more than an incidental burden on interstate commerce.
 
 
 85
 As to the so-called balkanization situation, the PUC believes that this argument is misplaced. Citing the history of the perpetual conflict between local and federal regulatory bodies, see Panhandle Eastern Pipe Line Company v. Public Service Commission of Indiana, 332 U.S. 507, 523, 68 S.Ct. 190, 198, 92 L.Ed. 128 (1947), the PUC notes that this dual scheme has never created enough Congressional concern to generate legislative activity designed to promote uniformity of retail rate regulation. On the contrary, the PUC cites Arkansas Electric as expressly recognizing that the national fabric does not seem to have been seriously unraveled by reserving regulation of retail rates primarily to the jurisdiction of the states. The PUC refers to Bibb v. Navajo Freight Lines, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), as a statement by the Court that the mere possibility of conflict between state regulatory considerations and goals of interstate commerce is not sufficient ground for invalidating a state law. Rather, actual conflict must exist which clearly impacts upon instrumentalities of commerce.
 
 
 86
 The district court evaluated the commerce clause issue by following the guidelines of Pike v. Bruce Church. The court then analyzed Equitable's evidence in support of a showing of an unlawful discriminatory effect on interstate commerce by Act 74 and rejected it in favor of the PUC's allegation that Equitable's evidence was speculative and inconclusive and demonstrated only a negligible impact on interstate commerce given the legitimate goal of protecting the local consumers from exorbitant utility rates.
 
 
 87
 The court then reviewed the history of natural gas regulation and referred to Congress' recent attempts at providing reasonable prices and adequate supply of gas to the consumers. The court then noted recently-enacted FERC Order 380[11] as an attempt by the federal agency to carry the notion of price sensitivity into contractual relationships between producers, pipelines and distributors.
 
 
 88
 In light of this FERC-expressed sentiment, the district court opined that Act 74 "dovetailed nicely with the current federal attitude" and accomplished at the intrastate retail rate exactly what FERC was attempting to accomplish at the interstate level through enactment of FERC Order 380.
 
 
 89
 The court then concluded that although the PUC's action may have some effect on interstate commerce, it was incidental as the legitimate local purpose advanced outweighed any burden imposed. The court further found that the PUC's action did not simplistically favor in-state gas producers over producers from other states; rather, the PUC operated evenhandedly to assure protection of the retail customer.
 
 
 90
 As to Equitable's "balkanization" argument, the district court likewise dismissed it as too speculative and found that Equitable failed to point with any specificity to any other regulatory proceedings which have resulted in an actual conflict with the PUC Order.
 
 
 91
 We agree with the district court that the commerce clause standard as defined by Pike v. Bruce Church controls the outcome of this issue. The crucial inquiry is whether Act 74 is basically a protectionist measure, operating in discriminatory disregard of interstate commerce, or whether it can fairly be viewed as a law directed to legitimate local concerns, accompanied by only an indirect burden upon interstate commerce.
 
 
 92
 The commerce clause requires that states exercise their regulatory authority not in a manner exhibiting purely local favoritism in commercial concerns nor in a manner detrimental to the national concern of the free flow of gas in interstate commerce. Act 74 withstands commerce clause scrutiny under this standard because we find no evidence to indicate that it poses more than an incidental burden on interstate commerce and find instead that the Act complements the federal goal of consumer protection.
 
 
 93
 Act 74 permits the PUC to compare a gas utility's actual purchases with available competing alternatives so as to assist the PUC's determination of whether a least cost policy has been pursued. In so doing, neither Act 74 nor the PUC order created any new loss or risk not traditionally associated with utility regulation. The statute requires the utility to pursue a least cost fuel procurement policy; it does not require purchases from in-state producers except to the extent that the local producer is selling the least expensive fuel. Because the statute does not distinguish in terms of local producers and out-of-state producers, it does not violate the commerce clause.
 
 
 94
 In a multiple regulatory environment, there results an inevitable overlap when evaluating costs. This overlap, however, does not automatically trigger conflict because each regulatory body sets rates for only that portion of activity over which they possess jurisdiction. Undeniably, in an indirect manner, both FERC and the PUC will scrutinize costs beyond their jurisdictions; this crossing of lines is inherent in a regime of multiple regulation. What is critical is that both FERC and the PUC are later obligated to narrow their particular focus to set rates for only that segment of the utility services over which they have jurisdiction.
 
 
 95
 We likewise dispute Equitable's belief that the legislative history of Act 74 proves intent of an unlawful discrimination in its enactment. Reliance on legislative debate in interpreting the intent or meaning of a statute is contrary to Pennsylvania law, see Commonwealth v. Alcoa Properties, Inc., 440 Pa. 42, 269 A.2d 748 (1970), and therefore the remarks of individual legislators cannot be binding as to legislative intent. Hoffman v. Pennsylvania Crime Victim's Compensation Board, 46 Pa.Commw. 54, 405 A.2d 1110 (1979). The motivation of particular members of the state legislature does not render a valid statute invalid. A court may even hypothesize motivations of a state legislature in order to find a legitimate objective promoted by the provision under attack. Malmed v. Thornburgh, 621 F.2d 565 (3d Cir.1980). Regardless, the remarks cited by Equitable seem to indicate only a desire for consumer protection, certainly a legitimate local interest.
 
 
 96
 As to Equitable's fear of the balkanization effect, although we acknowledge that the company's various activities certainly are subject to numerous regulatory bodies, we concur with the district court that Equitable's cry as to destructive consequences is speculative since it has produced no evidence probative of actual conflict.
 
 III.
 Due Process
 
 97
 On appeal Equitable raises for the first time the legal argument that the constitutional prohibition against the unlawful taking of property without due process was infringed by enactment of Act 74. Equitable cites as reversible error the district court's failure to consider the retroactive nature of the PUC Order, the zero return on equity resulting from the capitalization eventually approved by the PUC, and that the $14.3 million disallowed represented unavoidable costs incurred by Equitable. Alleging that the combined effect of these three elements equated to an unlawful taking, Equitable cites Bluefield Water Works and Improvement Company v. Public Service Commission of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), for the proposition that to avoid being characterized as confiscatory utility rates must be sufficient to yield a reasonable rate of return. It argues further that the PUC Order unlawfully sets rates retroactively since the gas at issue already has been paid for and consumed prior to issuance of the Order.
 
 
 98
 The PUC does not deny the utility company's right to earn a fair return on property. It cites, however, its duty as a regulating authority to determine the fairness of the requested rate. San Diego Land and Town Company v. Jasper, 189 U.S. 439, 23 S.Ct. 571, 47 L.Ed. 892 (1903). The PUC also cites the landmark Bluefield decision but for a contrary reason, i.e., to demonstrate that a utility's return generally should equate to that of businesses of comparable risk and uncertainty, and that:
 
 
 99
 The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.
 
 
 100
 Id. 262 U.S. at 693, 43 S.Ct. at 679.
 
 
 101
 The PUC, noting its philosophy of requiring prudent management as a precondition to recovery of purchased gas costs, asserts that Equitable's purchase from Kentucky West did not reflect such sufficient and economical management as outlined in Bluefield. The PUC contends that if every utility rate-making disallowance could conceivably constitute an unconstitutional taking, the rate-making process would become a nullity.
 
 
 102
 Although the theory of a taking was not formally raised, the district court recognized it as inherent in Equitable's allegation that denial of the pass-through would reduce its return on investment to zero. The district court dispensed with the theory in a brief footnote, deciding that a regulated company cannot assert a due process claim when the prudence of its expenditures is at issue.
 
 
 103
 We agree with the district court that an imprudent managerial decision affecting the company's rate of return cannot serve as the basis for an argument that the PUC's rate-making rises to the level of confiscatory activity. We note that the PUC reviewed the evidence and concluded that Equitable had failed to exercise reasonable managerial prudence in the purchasing of its gas supplies. That conclusion was based on the Commission's finding that Equitable had made a conscious decision to purchase gas from Kentucky West when less expensive gas had been available from other sources. The Pennsylvania Commonwealth Court has affirmed that this finding of fact was supported by substantial evidence. Their decision is res judicata. Consequently, disallowing the pass-through of the purchase price of the Kentucky West gas did not constitute confiscation.
 
 
 104
 With respect to Equitable's claims of retroactivity, we note that Equitable voluntarily chose the ratemaking procedure which would include historical as well as prospective data. Act 74, 66 Pa.C.S.A. Sec. 1307, provides for adjustment of utility rates to reflect changes in the utility's purchased fuel costs without the considerably more extensive inquiry required under Sec. 1308 governing approval of rate increases generally. This expedited procedure is a voluntary mechanism and the rate proceeding under Sec. 1307 is instituted by the utility itself. The statute very clearly requires that the gas costs which may be passed through to consumers must meet the standards set out in Sec. 1318. Consequently, before electing to proceed under that section, Equitable was on notice that its actual gas costs for the previous 12-month period would be subject to scrutiny regarding the utility's pursuit of a least cost fuel procurement policy, and that purchases from affiliates would be subjected to a higher level of scrutiny. Having elected to submit to this procedure, Equitable cannot now be heard to complain of its retroactivity.
 
 
 105
 Finally, with respect to the challenge to the disallowance of allegedly unavoidable costs, the only portion of the $14.3 million which could be characterized as unavoidable costs would be minimum bill charges actually incurred. As we noted previously, the PUC disallowed the pass-through based on its findings that the purchases from Kentucky West were imprudent, even though already below minimum bill levels, because cheaper gas was available from alternate suppliers, no minimum bill payments had ever been made to Kentucky West by Equitable, and the likelihood that such payments would ever be made was too speculative and uncertain to justify inclusion of them in Equitable's estimated cost of service. Those findings were unchallenged before the district court, and the first finding above was affirmed by the Pennsylvania Commonwealth Court. Therefore, this record cannot support an inference that the costs were unavoidable.
 
 IV.
 Right to Counsel
 
 106
 We consider next Equitable's challenge to the PUC's direction to Equitable to employ counsel separate and independent from Kentucky West in further proceedings before FERC.
 
 
 107
 Act 74, 66 Pa.C.S. Sec. 1317(a)(1), requires that, in determining whether a utility has pursued a least cost fuel procurement policy, the PUC is required to determine whether the utility has vigorously represented its rate payers in proceedings before the FERC. The PUC found it questionable whether such vigorous representation could occur in view of Equitable's corporate structure and ordered "[t]hat in its next Sec. 1307(f) filing Equitable Gas Company certif[y]ied that it has employed separate independent counsel, with access to a technical staff separate and independent from its affiliated pipeline supplier, Kentucky West Virginia Gas Company, to represent it before the Federal Energy Regulatory Commission."
 
 
 108
 In a footnote, the district court noted Equitable's argument that this separate counsel directive violated its first amendment right of association, its right to petition the government for redress of grievances and denied due process rights. Yet the court declined to dispose of the issue, apparently deciding it was not ripe for adjudication. In refusing to address the issue, the district court instead noted that "the PUC may bring (the content of the directive) to the attention of FERC for whatever disposition FERC feels is appropriate if, and when, plaintiffs disregard the PUC's directive." Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission, 650 F.Supp. 659, 661 n. 4 (M.D.Pa.1986).
 
 
 109
 Equitable labels the district court's inaction as improper, alleging that it forced Equitable to disregard and, therefore, disobey, the PUC Order as a precondition to litigating its validity. Equitable cited County Court of Ulster County v. Allen, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), as authority for the federal courts' duty to decide constitutional issues if necessary to dispose of the matter before them. On appeal, Equitable argues that joint representation of different entities which share a substantial interest is protected by the due process clause of the Fifth Amendment and that this protection extends to proceedings before federal agencies. Equitable also argues that the order violates its statutory right to counsel under the Administrative Procedure Act, 5 U.S.C. Sec. 555(b).[12]
 
 
 110
 The PUC disputes Equitable's claim to a constitutional right to be represented by the same counsel as its affiliate, particularly when the interest of the affiliate could be in direct conflict with those of the utility.[13]
 
 
 111
 The Supreme Court has not recognized a constitutional right to counsel in a civil case or in a civil matter before an administrative agency. The statutory right to counsel under the Administrative Procedure Act has been construed to mean the right to counsel of one's choice. SEC v. Higashi, 359 F.2d 550, 553 (9th Cir.1966). In addition, where the right to counsel exists, the due process clause of the fifth amendment does provide some protection for the decision to select a particular attorney. United States v. Flanagan, 679 F.2d 1072, 1075 (3d Cir.1982), rev'd on other grounds, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). That protection, however, "goes no further than preventing arbitrary dismissal of a chosen attorney, and providing a fair opportunity to secure counsel of one's choice." Id. Thus the right to counsel does not mean an absolute right to the lawyer of one's choice.
 
 
 112
 Inherent in the right to counsel is the right to the assistance of counsel unimpaired by conflicts arising from joint representation. The right to conflict-free representation may be waived in the interest in employing counsel of one's choice. Id. In fact, courts have held that joint representation must be permitted where the interests of a witness and a corporation are common, i.e., the witness may be held responsible for the acts of a corporation and counsel for the corporation was also counsel most familiar with the source of the witness's vulnerability. SEC v. Higashi, 359 F.2d at 553. However, where there exists a potential for conflict, ordering parties to retain separate counsel violates neither due process nor the APA. FTC v. Exxon Corp., 636 F.2d 1336, 1342 (D.C.Cir.1980).
 
 
 113
 The PUC Order was predicated on the finding that Equitable's interests in common with Kentucky West might be adverse to those of Equitable's rate payers whom it was Equitable's duty to represent before FERC. In support of its argument Equitable advanced an affidavit appended to its complaint averring, in essence, that the job of the general counsel of Equitable Resources will become more difficult by conformity with the PUC Order. However, the general counsel's affidavit also acknowledges the potential for conflicting interest between Equitable and Kentucky West. This potential conflict served as one rationale for compelling separate counsel initially. The main rationale for the Order was that Equitable's congruence of interest with its affiliate wholesaler might compromise Equitable's statutory duty to represent its customers' interests in proceedings before the FERC.
 
 
 114
 We find no violation of federal law in the content of the PUC Order for separate counsel as raised before us.
 
 V.
 Discovery
 
 115
 We dispose of Equitable's claim regarding the district court's limiting the scope of discovery in short order. To find evidence in support of the claim that the enactment of Act 74 had the avowed unlawful purpose of discriminating against interstate commerce, Equitable sought discovery with respect to communications between the PUC, the Attorney General and the legislature during the period of deliberation of Act 74. The district court denied appellant's attempts to compel responses to these discovery requests. Equitable alleges that the denial was in error claiming that the district court abdicated its responsibility to examine all the facts and circumstances indicative of discriminatory animus on the part of the state law-making body and the PUC.
 
 
 116
 We review discovery matters by the abuse of discretion standard. Public Loan Company v. Federal Deposit Insurance Corporation, 803 F.2d 82 (3d Cir.1986). We have already addressed similar evidence of legislators' intentions (see p. 617) and concluded that under Pennsylvania law it was irrelevant. Equitable's desire to delve into communications between the legislature and the PUC and the Attorney General is beyond the necessary scope of discovery since the meaning and intent of Act 74 is clear. We find, therefore, that the district court did not abuse its discretion in denying discovery related to inadmissible and irrelevant matters.
 
 VI.
 
 117
 In accordance with the foregoing, we find neither Act 74 nor the PUC Order unconstitutional. We will, therefore, affirm the court's denial of injunctive and declaratory relief sought by Equitable.
 
 
 
 [1]
 The least-cost gas purchasing requirement has four elements. 66 Pa.C.S.A. Sec. 1318(a)(1)-(4) reads:
 (a) General rule.--In establishing just and reasonable rates for those natural gas distribution utilities with gross intrastate operating revenues in excess of $40,000,000 under section 1307(f) (relating to sliding scale of rates; adjustments) or 1308(d) (relating to voluntary changes in rates) or any other rate proceeding, the commission shall consider the materials provided by the utilities pursuant to section 1317 (relating to regulation of natural gas costs). No rates for a natural gas distribution utility shall be deemed just and reasonable unless the commission finds that the utility is pursuing a least cost fuel procurement policy, consistent with the utility's obligation to provide safe, adequate reliable service to its customers. In making such a determination, the commission shall be required to make specific findings which shall include, but need not be limited to, findings that:
 (1) The utility has fully and vigorously represented the interests of its ratepayers in proceedings before the Federal Energy Regulatory Commission.
 (2) The utility has taken all prudent steps necessary to negotiate favorable gas supply contracts and to relieve the utility from terms in existing contracts with its gas suppliers which are or may be adverse to the interests of the utility's ratepayers.
 (3) The utility has taken all prudent steps necessary to obtain lower cost gas supplies on both short-term and long-term bases both within and outside the Commonwealth, including the use of gas transportation arrangements with pipelines and other distribution companies.
 (4) The utility has not withheld from the market or caused to be withheld from the market any gas supplies which should have been utilized as part of a least cost fuel procurement policy.
 
 
 [66]
 Pa.C.S.A. Sec. 1318(a)(1)-(4)
 
 
 [2]
 In the appeal before the Commonwealth Court, Equitable withdrew the constitutional claims it had raised at the agency level and prepared its appeal solely on whether substantial evidence supported the PUC determination
 
 
 [3]
 Section 4(a) of the Natural Gas Act, 15 U.S.C. Sec. 717c(a), empowers the FERC to determine the reasonableness of proposed rates:
 (a) All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.
 
 
 [4]
 The Pennsylvania Attorney General and the Office of Consumer Advocate are intervenor defendants in this action. The Federal Energy Regulatory Commission is a named defendant, but their position is more akin to that of an amicus. In the district court proceeding, FERC filed a letter indicating its possible intention to participate in this matter on appeal and has now filed a brief outlining the federal agency's position on certain questions before us
 The American Gas Association (AGA) was permitted to participate in the suit as an amicus curiae. Hereinafter, unless otherwise noted, the defendants will be collectively referred to as the PUC.
 
 
 [5]
 The supremacy clause of the United States Constitution prohibits state actions which interfere with matters where the federal government has spoken. The seminal statement on preemption originated from Chief Justice Marshall in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436, 4 L.Ed. 579 (1819): "States have no power ... to retard, impede, burden or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government...."
 
 
 [6]
 An agency's interpretation of its own authorization statute is entitled to some deference, constrained of course by our obligation to honor the clear meaning of a statute as revealed by its language, purpose and history. Hi-Craft Clothing Co. v. N.L.R.B., 660 F.2d 910, 915 (3d Cir.1981); see also, Director, Office of Workers' Compensation Programs, United States Department of Labor v. Mangifest, 826 F.2d 1318 (3d Cir.1987) (Weis, J., concurring)
 
 
 [7]
 The defined purpose of minimum bill contracts is to guarantee a long term supply of gas. In this instance, Kentucky West and Equitable are parties to a 20-year agreement which, by its terms, requires Equitable to purchase from Kentucky West a minimum amount of gas in exchange for which Kentucky West guarantees that that amount will be available for Equitable's consumption. Equitable is required to pay for a specified percentage (66 2/3%) of its total contractual entitlement, regardless of actual consumption. The minimum bill contract and the wholesale rate of Kentucky West's gas were approved by FERC
 
 
 [8]
 Judge Seitz questions whether this issue is even a proper one in a supremacy clause context
 
 
 [9]
 "All legislative powers ... shall be vested in a Congress ... [t]o regulate Commerce with foreign Nations and among the several States, and with Indian Tribes." Art. I Sec. 8 cl. 3
 
 
 [10]
 The word "balkanization" was coined by Judge Becker in the earlier appeal during oral argument of the abstention issue in alluding to the possibility of multiple exposure to conflicting orders of varying regulatory bodies operating in a number of jurisdictions. See supra at 604
 
 
 [11]
 FERC Order 380, effective July 31, 1984 (therefore not applicable to the minimum bill issue presented herein), had the effect of eliminating variable costs (primarily the cost of purchased gas) from minimum bill commodity charges. The impact of this Order was to reduce the amounts due by virtue of these minimum bill contracts, as users will no longer be monetarily obligated for gas not taken
 
 
 [12]
 The Administrative Procedure Act, 5 U.S.C. Sec. 555(b) reads as follows:
 (b) A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding....
 
 
 [13]
 There has been no challenge to the PUC's jurisdiction to issue an order governing representation before FERC