TROJAN TECHNOLOGIES, INC., Kappe Associates, Inc., Plaintiffs,

v.

COMMONWEALTH OF PENNSYLVANIA, Leroy Zimmerman, Atty. Gen. of PA, Defendants.

Civ. A. No. 89–0364.

United States District Court, M.D. Pennsylvania.

Jan. 5, 1990.

Paul A. Logan, Powell, Trachtman, Logan & Liddle, King of Prussia, Pa., for plaintiffs.

Thomas Brian York, Office of the Atty. Gen., Chief, Litigation Section, Harrisburg, Pa., for defendants.

1. The equipment is an ultraviolet light disinfec- tion system, known as UV–2000.

MEMORANDUM

CALDWELL, District Judge.

The parties to this declaratory judgment litigation have each filed a motion for summary judgment. At issue is the constitutionality of the Steel Products Procurement Act (73 P.S. § 1881 et seq.), enacted by the Commonwealth of Pennsylvania in 1978 (the Act). The Act requires public agencies, when undertaking the construction of public works, to include a provision in their contracts that the steel used in all projects be produced in the United States.

Plaintiff Trojan Technologies, Inc. is a Canadian corporation engaged in the manufacturing of equipment used in waste water/sewage treatment facilities. Kappe Associates, Inc. is Trojan's representative in Pennsylvania. In March 1988, the Attorney General of Pennsylvania received a request to investigate whether certain equipment manufactured by Trojan and suitable for use in public work projects, was in compliance with the Act. On June 29, 1988, the Attorney General determined that Trojan's equipment was covered by the Act.[1] He requested that Trojan submit documentation showing that the steel in its product was made in the United States. The Attorney General also requested information from seven municipal authorities concerning their possible purchase of Trojan's UV–2000 system, which could be in violation of the Act. The Attorney General intends to enforce the Act against Trojan, and although no proceedings have been instituted it is not disputed that the Act would preclude the use of the Trojan product in public work projects in Pennsylvania. This suit was filed on August 8, 1988 in the Eastern District Court of Pennsylvania and transferred to this District on February 2, 1989.

Plaintiffs' position that the Act is unconstitutional or invalid is based on the following:

1) The Act violates the Commerce Clause of the United States Constitution.

2) The Act is an intrusion into foreign affairs of the United States, an area reserved to the federal government.

3) The Act is preempted by federal statutes and foreign trade agreements between the United States and Canada.

4) The Act is void for vagueness.

### The Commerce Clause Challenge

■ Plaintiffs contend that the effect of the Act is to regulate the importing or sale in Pennsylvania of steel made outside the United States. Plaintiffs submit that the regulation of commerce with foreign nations is a subject that is within the exclusive control of the federal government under the commerce clause of the United States Constitution. Citation of authority is not required to affirm this basic principle, and if the Act does, in fact, regulate commerce with foreign countries it is invalid. A state law may violate the commerce clause if its purpose or effect is to discriminate against foreign competition. Examples of such illegal laws are *Bacchus Imports Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), where the state of Hawaii imposed a tax on the sale of liquor at wholesale but exempted certain locally produced beverages, and *Hunt v. Washington Apple Adv. Comm.*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), where a North Carolina statute attempted to limit the "grading" information that could be used on closed containers of apples shipped to North Carolina. In both instances the state laws discriminated against foreign products in favor of locally produced goods.

In opposing plaintiffs' motion for summary judgment, and in support of its cross motion, the defendants dispute that the Steel Products Procurement Act regulates commerce or otherwise intrudes in areas reserved to the federal government. The defendants contend that public agencies of the Commonwealth are "market participants", and that the Act does no more than limit the products that may be purchased or used in constructing public projects. Rather than "regulating" or attempting to regulate the sale in Pennsylvania of foreign made steel, the state contends it is legitimately supporting an important local and national industry by restricting steel purchases of public agencies to domestically produced steel.

The rationale for the "market participant" exception is illustrated in *Hughes v. Alexandria Scrap Corporation*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). Maryland enacted a complex statute aimed at reducing the volume of inoperable or junk vehicles in Maryland by offering an incentive to scrap processors. The law provided, among other things, for the payment of a "bounty" to scrap processors who destroyed and processed junk vehicles formerly titled in Maryland. Processors located in Maryland were provided an easy means of proving the origin of such vehicles, while non-Maryland scrap processors were held to a more demanding measure of proof in order to claim the bounty. Plaintiff, a Virginia scrap processor, challenged the statute as violative of the commerce clause. The Maryland District Court agreed, finding that the law imposed "substantial burdens upon the free flow of interstate commerce" and discouraged wreckers from taking vehicles out of Maryland for processing. The Supreme Court, however, reversed and held that the commerce clause does not require independent justification when a state enters the market as a purchaser:

> Nothing in the purposes animating the Commerce Clause forbids a State, in the absence of congressional action, from participation in the market and exercising the right to favor its own citizens over others.

The Supreme Court acknowledged that the effect of the statute may tend to keep junk vehicles from flowing to out of state processors, but noted that "no trade barrier of the type forbidden by the Commerce Clause ... impedes their movement out of state." (426 U.S. at 810, 96 S.Ct. at 2498, 49 L.Ed.2d at 231).

We find defendants' argument persuasive and conclude that public agencies applying the Act are no more than market participants in complying with the Act and

specifying the use of domestically produced steel in public work projects. The legislation at issue here does not attempt to control or limit the free flow, or the sale, of foreign steel products in Pennsylvania. The legislature simply announced that public agencies in Pennsylvania must support and foster the well being of an important state and national industry by restricting its purchases of steel or steel products to those made in this country. Although this action may reduce the volume of foreign steel actually sold in Pennsylvania, it does not create a barrier to its free flow into Pennsylvania. Just as with a private entity, the state may exercise a choice as to what it will purchase, but it does not thereby "regulate" commerce in the constitutional sense.

### The Intrusion of the Act into Foreign Affairs

■ Plaintiffs contend that the Act intrudes into foreign policy or international affairs, which is an area within the exclusive control of the federal government. Although the Constitution makes no express grant, the exclusive control of foreign affairs by the federal government is well established and beyond debate. Plaintiffs refer to several cases where state laws have been held to interfere in foreign matters. In *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581, (1941), the Supreme Court struck down a Pennsylvania law that required aliens to register annually with the state Department of Labor and Industry. The Court ruled that a similar federal law was intended by Congress as a comprehensive and uniform scheme for the regulation of all aliens, and rendered the state law unenforceable. In *Zschernig v. Miller*, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), the Supreme Court voided an Oregon law that placed conditions on the right of nonresident aliens to inherit property owned by Oregon decedents, holding that the law impaired the effective exercise of the nation's foreign policy. These laws each had a direct relationship to overriding national concerns, but we find no support in such holdings for concluding that the Act in question intrudes in foreign affairs. The Steel Products Procurement Act does not bring Pennsylvania into contact with a foreign government or with foreign affairs, and the only impact of the Act on other countries is incidental—i.e., a possible decrease in the total sales of foreign steel in Pennsylvania because public agencies will not buy it. This result, however, is traceable to participation in the market place and not to any effort to control or regulate commerce with foreign countries.

### Preemption by Federal Laws

■ Plaintiffs also argue that legislation such as the Act is preempted by various federal agreements or legislation, including the United States—Canada Free Trade Agreement. However, we doubt that Congress intended the trade agreement to preempt states from being "market participants," and there is no clear intent of Congress to forbid states from taking action to limit the source of their purchases of commodities. In *Kentucky West Virginia Gas v. P.U.C.*, 837 F.2d 600 (3d Cir.1988) the court outlined the three tests for determining if preemption has occurred:

1) when enacting federal laws, Congress explicitly announces its intent to preempt state law;

2) in the absence of express preemptive language, Congress indicates an intent to occupy an entire field of regulation, and leaves no room for states to supplement the federal law;

3) when compliance with state and federal law is impossible, or when state law is an obstacle to realizing Congressional objections.

We agree with defendants that preemption is not demonstrated. In none of the laws cited by plaintiffs has Congress prohibited states from being market participants, and the trade statutes or agreements in question are limited to the importation/purchase of foreign products by the federal government.[2] The Steel Products

---

**2.** In addition to the United States–Canada Free Trade Agreement, plaintiffs also refer to the Agreement on Government Procurement, etc. of 1979; the Steel Import Stabilization Act of 1974;

Procurement Act does not close Pennsylvania to the free flow of foreign steel products, and the court is not persuaded that the incidental result of reducing the quantities of foreign steel sold in Pennsylvania comes into conflict with trade policies, etc. of the United States. If a "buy-America" goal of a state intrudes into foreign affairs, or conflicts with federal trade efforts, Congress could easily occupy the field with express legislation to prohibit the practice by state governments.

### Vagueness of the Act

■ The Act requires that only "steel products," as defined in Section 1886, be used in all public agency projects. Plaintiffs contend the Act should be voided because of its imprecise definition of "steel products." Generally speaking "steel products" is defined as those produced from steel made in the United States. Plaintiffs argue that under the terms of the Act it cannot be ascertained where the line is drawn in deciding whether a public agency is dealing with an item covered by the broad definition in the Act. Plaintiffs pose their dilemma by asking whether a written report on a public project, held together by a steel staple, is a "steel product"; or are chairs supplied to a public agency that are held together by a few steel nails included within the definition; or is a calculator, held together with steel screws, a "steel product"? The steel in the product involved in this case constitutes about 15% of its total cost, but what if it were only 5% or 2%? Where is the threshold and how much steel is enough? Where both foreign and domestic steel are used in a product it is considered a "steel product", and acceptable, if 75% of the cost of the "articles, materials and supplies" have been "mined, produced or manufactured" in the United States, but how does one determine the meaning of the quoted language?

We agree with plaintiffs that many situations can be posed where the applicability of the Act would be difficult, if not impossible, to ascertain. But the legal test for vagueness is not based upon one's ability to conjure up a factual setting where the

application of a particular law is uncertain. The Supreme Court has announced that to avoid a vagueness challenge the law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1922). Moreover, when considering whether a law is void for vagueness the nature of the enactment must be considered. In *Village of Hoffman Estates, Inc. v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 371–372 (1982) the Court said:

> Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

In concluding that the ordinance at issue in *Hoffman Estates* did not implicate constitutionally protected conduct, the Supreme Court noted that, "a plaintiff who engaged in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others" (455 U.S. at 495, 102 S.Ct. at 1191, 71 L.Ed.2d at 369). Thus, the fact that the definition of "steel products" may be vague under other circumstances is unavailing to plaintiffs here. The parties have stipulated that the steel components of the UV–2000 system, constitute "less than 15%" of the cost of the system, but we find this to be a significant part of the product. Additionally, "sewage purification equipment" is a classification listed in category # 35 of the United States Department of Commerce's classification of machinery, which is incorporated by reference in the

the Trade Act of 1974; and the Trade Agreement Act of 1979.

definition of "steel products." If the steel in the UV–2000 system was not made in the United States it is not a "steel product" defined in the Act, and thus public agencies would be prohibited from including it in public works projects in Pennsylvania.

An appropriate order will be entered.

## ORDER

AND NOW, this 5th day of January, 1990, plaintiffs' request for declaratory and injunctive relief is denied. The Clerk of Court is directed to close this file.