**TROJAN TECHNOLOGIES, INC. and Kappe Associates, Inc., Appellants,**

v.

**COMMONWEALTH OF PENNSYLVANIA and Leroy S. Zimmerman, Attorney General, Commonwealth of Pennsylvania, Appellees.**

No. 90–5057.

United States Court of Appeals, Third Circuit.

Argued Aug. 10, 1990.

Decided Oct. 24, 1990.

Paul A. Logan (argued), Powell, Trachtman, Logan & Carrle, King of Prussia, Pa., for appellants.

Ernest D. Preate, Jr., Atty. Gen., Thomas B. York (argued), Deputy Atty. Gen., Calvin R. Koons, Sr. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of the Atty. Gen., Harrisburg, Pa., for appellees.

Stuart Gerson, Asst. Atty. Gen., Patricia M. Bryan, Deputy Asst. Atty. Gen., Robert V. Zener, Atty., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for amicus curiae U.S.

Before STAPLETON and GREENBERG, Circuit Judges and POLLAK *, District Judge.

## OPINION OF THE COURT

LOUIS H. POLLAK, District Judge.

This case presents the question whether the Pennsylvania Steel Products Procurement Act ("Steel Act"), Act of March 3, 1978, P.L. 6, No. 3, Pa.Stat.Ann. tit. 73, §§ 1881–87, is unconstitutional. The grounds of challenging the Steel Act are several: it is contended that the Steel Act (1) is preempted by various federal statutes and executive agreements regulating foreign commerce; (2) unconstitutionally burdens foreign commerce; (3) interferes with the federal government's exercise of the foreign relations power; (4) is unconstitutionally vague; and (5) violates the equal protection clause.

The essential facts are not in dispute. The Steel Act requires suppliers contracting with a public agency in connection with a public works project to provide products whose steel is American-made. Pa.Stat. Ann. tit. 73, § 1884. "Public agency" is

---

* The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

defined broadly to include not only state agencies but all local governmental entities including "all municipal ... authorities ... created or organized by any county, city, borough [or] township." Pa.Stat.Ann. tit. 73, § 1886.[1] The range of steel products affected is similarly exhaustive, covering "products rolled, formed, shaped, drawn, extruded, forged, cast fabricated or otherwise similarly processed ... by the open hearth, basic oxygen, electric furnace, Bessemer or other steel making process." *Id.* at § 1886.

Payments made in violation of the Act are "recoverable directly from the contractor, subcontractor, manufacturer or supplier who did not comply with" the Act. *Id.* at § 1885(a). Willful violators of the Act are prohibited from bidding on public agency contracts for five years. *Id.* at § 1885(b).

Appellant Trojan is a Canadian corporation that manufactures a "UV–2000" ultraviolet light water-disinfection system. Stipulation of Fact, ¶ 1. Appellant Kappe is Trojan's exclusive distributor in Pennsylvania. *Id.*, ¶ 2. The basic UV–2000 contains from four to eight ultraviolet lamps, located in a "UV Module." The UV Module, in turn, is housed in a stainless steel frame. Steel is also found in a stainless steel control box that houses many of the devices for monitoring the UV–2000's operation. The steel components constitute less than 15% of the UV–2000's total cost. *Id.*, ¶ 7–11.

The UV–2000 has applications in industry, potable water plants and residential use. Several Pennsylvania municipalities and authorities have purchased the UV-

2000 and installed it at waste-water and sewage-treatment facilities. *Id.*, ¶ 4–5. On July 8, 1988, the Pennsylvania Attorney General's Office sent letters to several municipal authorities requesting information concerning compliance with the Act. On July 11, 1988, the Attorney General's Office sent a letter directly to Trojan, requesting documentation confirming that its ultraviolet disinfection system complies with the Act. Trojan has not supplied any such documentation. While the Attorney General sought such information in order to ensure compliance with the Steel Act, there has been no final determination that the Act has been violated, nor have any sanctions been imposed. *Id.*, ¶ 20.

On August 8, 1988, Trojan and Kappe filed this suit against the Commonwealth and the Commonwealth's Attorney General in the District Court for the Eastern District of Pennsylvania, seeking a declaration of the unconstitutionality of the Steel Act and an injunction against its enforcement. On defendants' motion the case was transferred to the Middle District of Pennsylvania. The parties filed cross motions for summary judgment. On January 5, 1990, 742 F.Supp. 900, Judge Caldwell issued a memorandum and order denying Trojan's request for declaratory and injunctive relief. Appellants took this appeal. At the invitation of this court the United States has submitted a brief as *amicus curiae.*[2] We affirm.

## I. THE PREEMPTION CHALLENGE

In accordance with the principle that statutory questions should be considered

---

**1.** The full definition of "public agency" is

 (1) the Commonwealth and its departments, boards, commissions and agencies;
 (2) counties, cities, boroughs, townships, school districts, and any other governmental unit or district;
 (3) the State Public School Building Authority, the State Highway and Bridge Authority, and any other authority now in existence or hereafter created or organized by the Commonwealth;
 (4) all municipal or school or other authorities now in existence or hereafter created or organized by any county, city, borough, town-

ship or school district or combination thereof; and
 (5) any and all other public bodies, authorities, officers, agencies or instrumentalities, whether exercising a governmental or proprietary function.
Pa.Stat.Ann. tit. 73, § 1886.

**2.** The *amicus* brief supports the district court's decision on the preemption, commerce clause, and foreign affairs power issues; the brief takes no position on the vagueness and equal protection challenges, on the theory that the federal government has no institutional interest or expertise relevant to those claims.

first in order to avoid possibly needless constitutional inquiry, we turn initially to appellants' claim that the Steel Act is preempted by a variety of federal statutes and trade agreements.

■ Federal law may preempt state law in any of three ways. *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission,* 837 F.2d 600, 605 (3d Cir.) *cert. denied* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). First, Congress may explicitly occupy a regulatory field. *Id.* at 606. Second, preemption may occur when Congress completely, although not explicitly, occupies an entire field of regulation, leaving no room for the states to supplement federal law. *Id.; Schneidwind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). Finally, federal law preempts its state counterpart when simultaneous compliance with both state and federal law is "impossible or when state law stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress." *Kentucky West Virginia Gas,* 837 F.2d at 606 (citations omitted). Because of federalism concerns, it is presumed that Congress ordinarily does not intend to displace existing state authority. See *Tafflin v. Levitt,* — U.S. ——, 110 S.Ct. 792, 795, 107 L.Ed.2d 887 (1990). Further, "[w]here ... the field which Congress is said to have preempted has been traditionally occupied by the States," Congressional intent to preempt must be "clear and manifest." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). State procurement policy would appear to be such a field.

Appellants contend that the United States–Canada Free Trade Agreement, the Agreement on Government Procurement, the Steel Import Stabilization Act of 1984, the Trade Act of 1984 and the Trade Agreements Act of 1979 require an inference of Congressional intent to preempt state-level "buy-American" statutes such as Pennsyl-

vania's. Appellants argue both that each individual federal enactment justifies an inference of preemption, and that the cited acts and agreements *in toto* reveal an attempt to develop a comprehensive scheme that leaves no room for supplementary state activity.

## A. *International Agreements*

### 1. United States–Canada Free Trade Agreement

■ The United States–Canada Free Trade Agreement, 27 I.L.M. 281,—an executive agreement both negotiated and implemented pursuant to statutory directives— became effective January 1, 1989.[3] Chapter 13 of that agreement deals specifically with the issue of government procurement in areas of trade between the two nations. The chapter commits the parties to "actively strive to achieve, as quickly as possible, multilateral liberalization of international government procurement policies." Article 1301, Free Trade Agreement. The Agreement's implementing legislation provides that "[t]he provisions of the [Free Trade] Agreement prevail over—(A) any conflicting State law ... [and] any conflicting application of any State law to any person or circumstance ..." Implementation of the United States–Canada Free–Trade Agreement, Title I, Section 102. Appellants contend that the Steel Act runs counter to the Agreement's stated purpose of liberalizing government procurement policies and thus is preempted.

We are unpersuaded. The major difficulty with appellants' position is that the language chiefly relied on—"strive to achieve ... multilateral liberalization"—is hortatory rather than mandatory. Cf. *Wardair Canada, Inc. v. Florida Dept. of Revenue,* 477 U.S. 1, 10, 106 S.Ct. 2369, 2374, 91 L.Ed.2d 1 (1986) (distinguishing "international *aspiration*" and "the *law* as it presently stands," refusing to enforce the "aspiration" to strike a state tax) (emphasis in

---

**3.** The Agreement was negotiated by the President under authority of 19 U.S.C. § 2112(b). The Agreement was entered into on January 2, 1988 and the United States–Canada Free Trade Agreement Implementation Act was approved

by Congress on September 28, 1988, Pub.L. 100–449, 102 Stat. 1851, as amended by Pub.L. 101–207, § 1(b), 103 Stat. 1833, reprinted at 19 U.S.C. § 2112 [statutory notes].

the original). Indeed, rather than explicitly preempting state buy-American statutes, the Agreement seems tacitly to acknowledge and permit them. Article 1304 provides that "[t]he obligations of this Chapter shall apply only to procurements specified in Code Annex I." The Annex then specifies fifty-four *federal* agencies for coverage. Implicit in this specific designation omitting the states is Congress' acquiescence in, if not endorsement of, state buy-American statutes. Cf. *Wardair*, 477 U.S. at 12, 106 S.Ct. at 2375. The legislative history makes this point clear, noting that "[a]lthough discussions in the current version of the agreement were not successful in addressing barriers below the level of the Federal Government in either country, it is the Committee's understanding that the two governments will return to this subject at a later point." S.Rep. No. 100–509, 100th Cong., 2d Sess., at 65, U.S. Code Cong. & Admin.News 1988, pp. 2395, 2460 (report of the Senate Committee on Government Affairs).[4] Appellants provide no evidence that any subsequent negotiations have revisited and resolved questions about sub-national barriers. In the mean-

time, it is untenable to suggest that an agreement unsuccessful in addressing subnational trade barriers has preempted a state buy-American statute.

Appellants' position also overlooks Congress' substantial concern with *fair* trade, as distinct from *free* trade. Article 1301, on which appellants also rely, speaks of achieving "*mutually* beneficial trade opportunities in government procurement based on the principles of non-discrimination and *fair* and open competition." (emphasis added).[5] The legislative history notes Congress' concern "about the negative effect that provincial procurement barriers can have on the ability of U.S. exporters to compete for government procurement contracts in Canada." S.Rep. No. 100–509, 100th Cong., 2d Sess., at 65, U.S. Code Cong. & Admin.News 1988, P. 2460 (report of the Senate Committee on Government Affairs).[6] Given Congress' evident concern with achieving *reciprocal* trade barrier reduction it would be anomalous to draw the inference that the executive and legislative branches intended to require the *unilateral* elimination of state trade barri-

**4.** Canadian commentators agree, see e.g., J. Johnson & J. Schachter, *The Free Trade Agreement, A Comprehensive Guide*, § 4.2(3) (1988) (United States–Canada Free Trade Agreement Chapter on Government Procurement "is based on the [GATT] Procurement Code," discussed infra, from which "all provincial, state and local government procurement is excluded").

**5.** *See also,* the Trade Agreements Act of 1974, among the purposes of which is "to harmonize, reduce, and eliminate barriers to trade on a basis which assures substantially equivalent competitive opportunities for the commerce of the United States," 19 U.S.C. § 2102(2) and the Trade Agreements Act of 1979, where one "objective [is to] encourage countries to become parties to the [GATT Government Procurement Code] and provide appropriate reciprocal competitive government procurement opportunities to United States products...." 19 U.S.C. § 2512(b).

**6.** It is also to be observed that achieving United States–Canadian reciprocity in sub-national government procurement may require more than national legislation. While it is clear that, on the United States' side, Congress would have authority to act preemptively in this area as an exercise of its power over foreign commerce, it is not at all clear that the Canadian Parliament

has cognate authority. In Canada the allocation of authority between federal and provincial institutions, including the treaty power, is governed by §§ 91 (federal powers), 92 (provincial powers) and 132 (treaty power) of the Canadian Constitution, British North America Act, 1867, 30 & 31 Victoria c. 3 (consolidated with amendments), substantially amended by the Constitution Act, 1982, Can.Rev.Stat.1985, Appendix II, No. 44. Under the allocation of authority established by these sections, it may be that a federal undertaking to impose constraints on provincial purchasing policies would require approval of the individual provinces. See, *Attorney–General of Canada v. Attorney–General of Ontario* (the *Labour Conventions* case), [1937] A.C. 326, [1937] 1 D.L.R. 673 (Atkins, L.). See also, P. Hogg, *Constitutional Law of Canada*, 249–54 (2d ed.1985).

It also appears that Canadian provinces may enjoy rights similar to those accorded states under the market participant, see `infra` at 15, doctrine. See *Smylie v. The Queen* (1900) 31 O.R. 202, 222–23 (Ont.C.A.) (province has the power under § 92 to dictate the terms under which it disposes of its own property, thus permitting province to prohibit the harvest of timber from provincial lands unless harvester pledges to have timber processed in Canada before export). See also, P. Hogg, supra, at 570–74.

ers. The United States–Canada Free Trade Agreement does not constitute such a mandate.

### 2. Agreement on Government Procurement

The Agreement on Government Procurement was entered into in 1979 pursuant to the Tokyo Round of GATT negotiations. It was implemented by the President in 1982, pursuant to his authority under the Trade Agreements Act of 1979, 19 U.S.C. §§ 2511–18 and under 3 U.S.C. § 301. The Agreement contains detailed rules on the way in which government procurement contracts are to be awarded, including that governments will provide foreign nationals "treatment no less favorable than ... that accorded to domestic products and suppliers." Agreement on Government Procurement, Art. II.

Like the United States–Canada Free Trade Agreement, however, the Government Procurement Agreement only purports to cover fifty-four *federal* agencies. Furthermore, the Government Procurement Agreement contains express language suggesting that national governments will attempt to *persuade* local governments of the benefits of free trade.[7] If anything, then, the President and Congress have *disavowed* any intent to supersede such state legislation. The Agreement's legislative history confirms this view. See *Statement of Administrative Action*, printed in H.R.Doc. No. 96–153, 96th Cong., 1st Sess. 388, 466, *reprinted in* 1979 *U.S.Code Cong. & Admin.News*, 381, 665, 726–27 ("The Agreement does *not* cover ... all purchases by States and local governments, including purchases by States and local authorities with federal funds") (emphasis in the original); cf. *id.* at 479, *reprinted in* 1979 *U.S.Code Cong. & Admin.News* at 737–38 ("[p]urchases by state and local governments are not covered since the Agreement applies only to federal agencies specifically listed ... [t]he

Agreement obligates the U.S. government only to inform regional and local governments of the principles and rules of the Agreement"). In short, the Agreement on Government Procurement demonstrates no intent to preempt state buy-American statutes.

### B. *Statutes*

■ Appellants' preemption arguments also invoke the Steel Import Stabilization Act, P.L. 98–573, Title VIII, §§ 801–808, 98 Stat. 3043–47, codified at 19 U.S.C.A. § 2253 note (Supp.1990), the Trade Act of 1974, Pub.L. 93–618, 88 Stat.1978, (codified as amended in scattered sections of 5 U.S.C., 19 U.S.C. and 31 U.S.C.), and the Trade Agreements Act of 1979, Pub.L. 96–39, 93 Stat. 144 (codified as amended primarily in scattered sections of 19 U.S.C.). But these arguments, too, are wide of the mark. Much of the statutory language is either aspirational or so general as to be insufficient to justify a finding of preemption. See, e.g., Steel Import Stabilization Act, Sec. 802(a)(4) (describing a "national policy" for the steel industry); Trade Act of 1974, 19 U.S.C. § 2102(1), (2) (Supp.1990) (Act's purpose is to promote "open and nondiscriminatory world trade" and "to harmonize, reduce, and eliminate barriers to trade"); Trade Agreements Act of 1979, 19 U.S.C. § 2502(2) (Act's purpose is to promote "an open world trading system").

Those statutory provisions that are relatively specific fall short of establishing a comprehensive federal scheme or of revealing a direct conflict with the Steel Act. The Steel Import Stabilization Act, for example, establishes a mechanism for imposing quantitative limits on United States' steel imports. It does not, however, include regulations of price, quality or other terms of trade that if present would indicate comprehensive regulation. Similarly, the Trade Agreements Act, in making reference to the effects of state policy on

---

**7.** Article I, ¶ 2 provides, "The Parties shall inform their entities not covered by this Agreement and the regional and local governments and authorities within their territories of the objectives, principles and rules of this Agreement, in particular the rules on national treatment and non-discrimination, and draw their attention to the overall benefits of liberalization of government procurement."

international trade, goes only so far as to announce the "sense of Congress" that state agencies should not use *standards-related* activity[8] to create "unnecessary obstacles" to foreign trade. § 403, codified at 19 U.S.C. § 2533. We think it unlikely that a "sense of Congress" is sufficient to preempt a state statute establishing a standards-related barrier;[9] it certainly is insufficient to preempt other types of trade restrictions. Indeed, the cited provision suggests that Congress is aware of state activities affecting foreign trade and has decided to confine itself to persuasive appeals rather than mandatory preemption.

Such an approach is unsurprising given the Congress' previously mentioned concern that any reductions in barriers to trade be accomplished on a reciprocal basis. That concern has been expressed during the adoption of the agreements discussed above and during the adoption of the three trade acts relied on by appellants. See, e.g., Steel Import Stabilization Act, Sec. 802(a)(4) ("vigorous efforts ... needed to eliminate ... unfair trade practices"); Trade Act of 1974, § 2, codified at 19 U.S.C. § 2102(2), (3) (goal is "to assure[ ] substantially equivalent competitive opportunities for the commerce of the United States" and "establish fairness and equity in international trading relations"). Absent assurances of a reciprocal commitment by our trading partners, it appears that the Congress is as yet unwilling to preempt state buy-American legislation.

In sum, federal policy as reflected in the two international agreements and three statutes has left unadulterated a state's authority to enact buy-American legislation. These agreements and statutes do not constitute a comprehensive scheme so pervasive that it must exclude all state action with respect to foreign steel nor are they otherwise sufficient to support an in-ference of Congressional intent to preempt state buy-American legislation. The federal policy appears to have been the result of an explicit negotiating strategy, a strategy that permits such sub-national legislation pending sufficient trade concessions or assurances of mutuality on the part of our international trading partners. We offer no comment on the wisdom of that strategy except to say that courts should leave such matters to the responsible arbiters, Congress and the Executive. If Congress and the Executive conclude that a state statute such as the Steel Act is antithetic to the national interest, they have full authority to foreclose its continuing operation. But no such authority has yet been exercised.

## II. COMMERCE CLAUSE CHALLENGE

Article I, § 8 of the United States Constitution provides that "[t]he Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States." It is well established that this affirmative grant may sometimes prohibit state regulatory activity, even absent preemptive federal legislation. *Swin Resource Systems, Inc. v. Lycoming County*, 883 F.2d 245, 248 (3d Cir.1989) (citing *Cooley v. Brd. of Wardens*, 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996 (1852)). In particular, the "negative commerce clause," or "dormant commerce clause" as this residual constraint is often called, prohibits many discriminatory state regulations designed to promote local enterprise at the expense of that from other states or from foreign countries. The general rationale underlying the negative commerce clause is that it prevents the economic balkanization of the United States into fifty separate and impenetrable markets. *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979).[10]

---

**8.** "Standards-related activity" is a buyer's activity establishing performance and other technical criteria for goods that it will purchase, and for testing those goods to insure that they meet the standards established. See 19 U.S.C. § 2532.

**9.** See L. Tribe, *American Constitutional Law*, § 6–26, at 489 (2d ed. 1988) ("broad and ab-stract federal goals [are] given scant preemptive effect").

**10.** It is also well established that state enactments that might otherwise be barred by the dormant commerce clause are permissible if sanctioned by Congress. See, e.g. *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 434, 66 S.Ct. 1142, 1157, 90 L.Ed. 1342 (1945). The agree-

However, the Supreme Court has also made clear that "a state or state subdivision that acts as a market participant, rather than a market regulator 'is not subject to the restraints of the Commerce Clause.'" *Swin Resources*, supra, at 249 (quoting *White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 208, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1 (1983)). Put roughly, the market participant doctrine protects states when they are acting as parties to a commercial transaction rather than (as, for example, when adopting a tax scheme) they are acting as market regulators. See *Reeves, Inc. v. Stake*, 447 U.S. 429, 437, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980). Appellees, in arguing that the commerce clause does not invalidate the Steel Act, claim the protection of the "market participant doctrine." However, the Supreme Court has expressly reserved the question of whether state buy-American statutes that affect foreign commerce violate the commerce clause, or are permissible under the market participant doctrine or on other grounds. *Id.* at 437, n. 9, 100 S.Ct. at 2277, n. 9.[11]

To analyze appellants' commerce clause challenge, the first question we face is whether the state, in enacting and enforcing the Steel Act, is a market regulator or a market participant. We are satisfied that if Pennsylvania is only a participant, the inquiry is at an end, *White*, 460 U.S. at 210, 103 S.Ct. 1042; for the reasons developed below, we are convinced that with respect to state buy-American statutes there can be no commerce clause intrusion even in a foreign commerce context where there is no attempt to regulate.[12]

Appellants argue that market participant status is unavailable to Pennsylvania because the Commonwealth is not a buyer of appellants' disinfection system. Instead, appellants stress that their customers are local governmental units distinct from the Commonwealth. Appellants contend that in controlling the purchases of these local entities, the Commonwealth is regulating actors other than itself, thereby forfeiting market participant status.

Appellants rely heavily on *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486 (7th Cir.1984). In *Window* the Seventh Circuit struck down an Illinois statute that required public works contractors, including those who contracted with local political subdivisions, to hire only Illinois laborers. *Id.* at 489. Defending its statute, Illinois contended that local subdivisions were part of the state, and that, in controlling local transactions, it was doing nothing more than directing with whom the state itself would do business, a privilege available under the market participant doctrine.

The Seventh Circuit, however, held that, for purposes of the market participant doctrine, local political subdivisions are not part of a state. The court acknowledged that for many purposes such local subdivisions are part of state government. However, the court concluded that there was an "analytical and qualitative" difference between a state requiring state agencies to hire state residents on public works projects and a state requiring local govern-

ments and statutes discussed in Part I of this opinion seem to us to come exceedingly close to providing such approval. If such were the case, there would be no dormant commerce clause issue to be decided as the state legislation would have received a Congressional imprimatur. Cf. *Wardair Canada v. Florida Dept. of Revenue*, 477 U.S. 1, 9–13, 106 S.Ct. 2369, 2373–75, 91 L.Ed.2d 1 (1986). However, since these agreements and statutes do not contain a clear statement of acquiescence in state buy-American statutes, we will go on to consider the commerce clause challenge.

**11.** Two state courts have come to competing conclusions on this issue. Compare *Bethlehem Steel Corp. v. Board of Commissioners*, 276 Cal.

App.2d 221, 80 Cal.Rptr. 800 (1969) with *K.S.B. Technical Sales Corp. v. North Jersey Dist. Water Supply Comm'n*, 75 N.J. 272, 381 A.2d 774 (1977), appeal dismissed 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978).

**12.** A determination that Pennsylvania is acting as a regulator would not, standing alone, be sufficient to invalidate Pennsylvania's statute. Instead it would bring us only to the next step of commerce clause inquiry, i.e. determining whether the statute serves a legitimate state purpose that cannot be equally well served by nondiscriminatory means. *Maine v. Taylor*, 477 U.S. 131, 140, 106 S.Ct. 2440, 2448, 91 L.Ed.2d 110 (1986).

mental units to do the same. The analytical difference lay in the lack of state involvement that results when neither state supervision nor state funds are included in a project. *Id.* at 496. The quantitative difference resulted from the breadth of local public works projects. Proceeding on the assumption that local municipalities do much more public contracting than state central governments, the *Window* court thought that extending market participant protection to such regulatory schemes "could do great damage to the principles of free trade on which the negative commerce clause is based." *Id.* The court thus held that such a scheme does not qualify for protection under the market participant doctrine and hence violates the commerce clause. *Id.* at 495, 496.[13]

Respectfully, we disagree. We find no compelling analytical difference between a local government unit and central state agencies. Both exist only through affirmative acts of the state. A municipality derives its authority from the state. *United Building and Construction Trades Council of Camden County v. Mayor and Council of the City of Camden*, 465 U.S. 208, 215, 104 S.Ct. 1020, 1025, 79 L.Ed.2d 249 (1984).[14] Under Pennsylvania law it is clear that the local bodies covered by the statute exist only by grace of state authority and with such powers as the state affirmatively provides.[15] We see no reason why, attendant on making such affirmative grants of power, the Commonwealth may not also restrict the contracting authority of such local bodies. Imposing such restrictions on central state agencies certainly would be permitted and we do not believe restrictions on local bodies stand in any different light.

It may be true that local municipalities and authorities are responsible for the great bulk of sub-national public procurement. However, we find no suggestion in the Supreme Court's previous forays into this area that the quantum of market purchases should affect a public entity's qualification for market participant status. Indeed, to accept the argument would suggest the curious result that identical legislation adopted by small and large states might suffer different constitutional fates.

We believe the Court's decision in *White* further supports our conclusion. There, the Supreme Court upheld an order by the Boston mayor requiring that all city and federally funded construction projects be performed by a work force of at least half Boston residents. The Court rejected a claim that the order violated the commerce clause because it effectively regulated employment contracts between private contractors and their employees, contracts to which the city was not a party. The Court reasoned that "the Commerce Clause does not require the city to stop at the boundary of formal privity of contract ... [e]veryone affected by the order is, in a substantial if informal sense, " 'working for the city.' " *White*, 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7. If employees of a private contractor can be thought to be in relationship with the city, we think it equally clear that suppliers of a local public entity can be thought to be "supplying for the state." As the ultimately controlling public purchaser, the Commonwealth enjoys the same right to specify to its suppliers the source of steel to be used in any supplies provided as is enjoyed by similarly situated private purchasers.

13. The Seventh Circuit also held that the statute was unconstitutional under the privileges and immunities clause of Article IV.

14. See *City of Trenton v. State of New Jersey*, 262 U.S. 182, 187, 43 S.Ct. 534, 536, 67 L.Ed. 937 (1923) (a state "may withhold, grant or withdraw powers and privileges as it sees fit. However great or small [the municipality's] sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will.").

15. See, e.g., *Department of Public Welfare v. Adams County*, 30 Pa.Commw. 164, 373 A.2d 143, 145 n. 4 (1977) (Commonwealth "exercise[s] absolute control over counties") *rev'd on other grounds*, 481 Pa. 230, 392 A.2d 692 (1978); *Plum Twp. Annexation Case*, 178 Pa.Super. 376, 116 A.2d 260 (1955) ("all municipalities are agents of the state"); *Darby v. Sharon Hill*, 112 Pa. 66, 4 A. 722 (1886) (borough is "merely an agency instituted by the sovereign") and *Simon Appeal*, 408 Pa. 464, 184 A.2d 695 (1962) (municipal authority is "an independent agency of the Commonwealth").

Nor do we find that the commerce clause's underlying purposes require a broad prohibition against state regulation of local municipal purchases. As noted in *Reeves*, "the Commerce Clause responds principally to state taxes and regulatory measures impeding free *private* trade in the national marketplace ... [t]here is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." 447 U.S. at 436–37, 100 S.Ct. at 2277 (emphasis added). Nor, we take it, is there any indication of an intent to limit the market operations of local public entities. Given that local entities can presumably decide for themselves to contract only for American steel, cf. *White*, 460 U.S. at 215, 103 S.Ct. at 1048, we think it clear that the Commonwealth, from which local municipalities derive their power, can impose similar limits.

We also are not persuaded that the fact that the products being excluded are of foreign origin countenances a different result. It is true that the Supreme Court has suggested that statutes affecting foreign commerce are subject to a more searching review. *Reeves*, 447 U.S. at 437 n. 9, 100 S.Ct. at 2277 n. 9.[16] In striking Alaska's requirement that timber taken from state lands be processed in-state, the *Wunnicke* plurality stated

> [w]e are buttressed in our conclusion that the restriction is invalid by the fact that foreign commerce is burdened by the restriction. It is a well-accepted rule that State restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny. It is crucial to the efficient execution of the Nation's foreign policy that "the Federal Govern-

ment ... speak with one voice when regulating commercial relations with foreign governments."

*South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 100, 104 S.Ct. 2237, 2247, 81 L.Ed.2d 71.

We hold, however, that the Pennsylvania statute survives even the most searching review. In *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), the Court identified two concerns that underlie the application of a more probing analysis to state statutes that affect foreign commerce. First, there is the danger of multiple taxation. *Id.* at 446, 99 S.Ct. at 1820. That concern is not implicated by the Steel Act. Second, state enactments may "impair federal uniformity in an area where federal uniformity is essential." *Id.* at 448, 99 S.Ct. at 1821. We do not believe state procurement policy to be such an area. State procurement practices present no problems of reconciling conflicting policy among multiple national sovereigns. Compare *id.* at 450, 99 S.Ct. at 1822. Furthermore, the record in this case shows that Congress is aware of state activity[17] to restrict procurement of foreign goods, see supra, Part I, and yet has not imposed a policy of national uniformity. Thus, state procurement policy fits comfortably within the Supreme Court's observation that nothing in "the Foreign Commerce Clause *insists* that the Federal Government speak with any particular voice." *Wardair Canada v. Florida Dept. of Revenue*, 477 U.S. 1, 13, 106 S.Ct. 2369, 2375, 91 L.Ed.2d 1 (1985).[18] To the degree that Pennsylvania's statute implicates foreign policy in areas other than commercial trade, appellants' objections are best fo-

**16.** The Court stated that "Commerce Clause scrutiny may well be more rigorous when a restraint on foreign commerce is alleged" (citing *Japan Line Ltd. v. County of Los Angeles,* 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979)).

**17.** Pennsylvania is one of at least eleven states that have some form of buy-American legislation. See Ala.Code § 39–3–4 *et seq.* (1987 Supp.), Ill.Rev.Stat. ch. 48, para. 1801 *et seq.* (1986), Ind.Code Ann. § 5–16–8–2 *et seq.* (West 1984), Mass.Gen.Laws Ann. ch. 7 § 22 (1969), Md.State Fin. & Proc.Code Ann. § 12–401 *et seq.* (1985), N.Y.State Fin.Law § 146 (1988), W.Va.

Code § 5–19–1 *et seq.* (1987), R.I.Gen.Laws § 37–2.1 *et seq.* (1984), Ohio Rev.Code Ann. § 153.011 (1987), N.J.Stat.Ann. § 40A:11–18 (West 1973).

**18.** In *Wardair* the Court upheld a Florida aviation fuel tax as applied to a Canadian air carrier engaged in international traffic. The tax was upheld despite the United States being a party to more than seventy bilateral and multilateral aviation agreements, many of which contain provisions governing fuel taxes. 477 U.S. at 9–13, 106 S.Ct. at 2373–75.

cused on the federal government's power to control foreign affairs rather than the commerce clause. It is to that aspect of appellants' claims that we now turn.

## III. THE FOREIGN AFFAIRS POWER CHALLENGE

█ The formulation and administration of foreign affairs is vested exclusively in the federal government. Consequently, any state law that involves the state in the actual conduct of foreign affairs is unconstitutional. *United States v. Pink*, 315 U.S. 203, 233, 62 S.Ct. 552, 567, 86 L.Ed. 796 (1942). See also, L. Tribe, *American Constitutional Law*, § 4–6, at 230 (2d ed. 1988) ("state action, whether or not consistent with current federal foreign policy, that distorts the allocation of responsibility to the national government for the conduct of American diplomacy is void"). In contrast, any action that has only " 'some incidental or indirect effect in foreign countries' " does not intrude on the foreign relations power. *Zschernig v. Miller*, 389 U.S. 429, 432, 88 S.Ct. 664, 666, 19 L.Ed.2d 683 (1968) (citation omitted).

On only one occasion has the Supreme Court struck down a state statute as violative of the foreign relations power. In *Zschernig* the Court held unconstitutional an Oregon statute which provided that a nonresident alien could not inherit from an Oregon decedent unless three conditions were met: (1) the alien's government must accord Americans the right to inherit on equal terms; (2) the alien's government must give Americans the right to receive payment in the United States of funds from foreign estates; and (3) foreign heirs inheriting from Oregon estates must be able to do so without confiscation by their government.

In considering the application of the Oregon statute, the Court noted that Oregon courts, and other state courts enforcing

similar statutes, had routinely launched inquiries into the type of government that obtained in the inheritor's country, inquiries that radiated cold war attitudes regarding the democratic or Marxist characteristic of various regimes. *Id.* at 434–35, 88 S.Ct. at 667–68. The Court concluded that the "real desiderata" of Oregon court decisions were the foreign policy attitudes of local probate courts, attitudes that moved with the wax and wane of the cold war. *Id.* at 437, 88 S.Ct. at 668. Applied in this way, the Court thought that the Oregon statute "held great potential for disruption or embarrassment." *Id.* at 435, 88 S.Ct. at 667. The Court concluded that the statute had a direct impact upon foreign relations and had potential to affect adversely the power of the central government to deal with such problems. As such it was invalid. *Id.* at 441, 88 S.Ct. at 671.

The Pennsylvania statute exhibits none of the dangers attendant on the statute reviewed in *Zschernig*, for Pennsylvania's statute provides no opportunity for state administrative officials or judges to comment on, let alone key their decisions to, the nature of foreign regimes. On its face the statute applies to steel from any foreign source, without respect to whether the source country might be considered friend or foe. Nor is there any indication from the record that the statute has been selectively applied according to the foreign policy attitudes of Commonwealth courts or the Commonwealth's Attorney General.[19] And while it is possible that sub-national government procurement restrictions may become a topic of intense international scrutiny, and a target in international trade negotiations, that possibility alone cannot justify this court's invalidation of the Commonwealth's statute. This is especially true when Congress has recently directed its attention to such restrictions and has taken no steps to preempt them through

19. Appellants do suggest that Pennsylvania's enforcement inquiries were made only at the request of a Trojan competitor. The suggestion is *dehors* the record, as the facts stipulated by the parties make no mention of how Trojan's potential violation originally came to the Attorney General's attention. Even if true, appellants' allegation does not establish—indeed, it does not even suggest—that the statute is being selectively enforced against suppliers from only a particular nation or group of nations, according to foreign policy attitudes held by Pennsylvania officials.

federal legislation. Indeed, in light of Congress' evident concern with achieving freer trade on a reciprocal basis, to strike Pennsylvania's statute would amount to a judicial redirection of established foreign trade policy—a quite inappropriate exercise of the judicial power.

## IV. THE VAGUENESS CHALLENGE

 Appellants and appellees agree that controlling vagueness doctrine is set out in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). In *Grayned* the Court explained

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Id.* at 108–09, 92 S.Ct. at 2298–99. Thus, a statute should be struck as vague if (1) it fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) it fails to provide explicit standards to the enforcing officer, in this case Pennsylvania's Attorney General.

> The Court also has declared that economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the

regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

*Village of Hoffman Estate v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982).[20] *Hoffman Estates* added that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495, 102 S.Ct. at 1191.

Appellants first contend that the Steel Act should be subject to a relatively strict vagueness review, as the sanctions it imposes—characterized by defendant as civil penalties but "commercially devastating," Appellants' Brief, at 42—are severe. We disagree. It is not clear to us that barring a supplier from public contracting within the Commonwealth for five years is severe. Such a supplier remains free to participate in the private Pennsylvania market and to supply purchasers in other states. In any case, for purposes of testing the penal severity of a given statute, *Hoffman Estates* focused on the distinction between criminal and civil sanctions, i.e. between incarceration and financial penalties. We know of no case in which a civil statute has been subjected to strict vagueness review. Thus, Pennsylvania's statute will be measured against the more deferential standard usually attendant on commercial regulation.

Appellants contend that the statute is vague in several respects. First, appellants argue that the definition of "steel products," Pa.Stat.Ann. tit. 73, § 1886, is inadequate because (1) it fails to identify how much steel must be fabricated into otherwise non-steel products to convert that product into a "steel product," Appellants' Brief, at 43–45, and (2) it fails to provide standards for determining when

---

**20.** We note that this suit effectively presents a facial challenge to the statute, i.e. there is nothing in the record to indicate how the statute has been interpreted by the Pennsylvania courts and the Pennsylvania Attorney General, nor is there any indication of what, if any, administrative mechanisms may be available to clarify the statute's coverage.

steel is "United States steel," Appellants' Brief, at 45–47.

To demonstrate the first of these points, appellants set out a parade of horribles, e.g. is a wooden chair with nails a steel product? But rhetorical questions of this sort, though intriguing, are not to the point. As noted in *Hoffman Estates*, appellants' burden is to show that the statute is vague with respect to *their* activity. The statutory definition of steel products expressly incorporates the United States Commerce Department Standard Industrial Classification 35. Classification 35 specifically includes "sewage purification equipment." The UV–2000 undoubtedly falls within such a class, giving appellants ample warning that their product is within the Steel Act's ambit.[21]

Appellants also claim that "steel products" is vague because it provides no standards for determining when "articles, materials, and supplies" have been "mined, produced, or manufactured" or "melted and manufactured" in the United States. Appellants note specifically that much steel is reprocessed, resulting in the final product becoming the combination of foreign and domestic steel. Under such circumstances, appellants claim that "United States steel" is inherently vague.

However, the difficulty facing appellants is not that the definition of United States steel is vague but that as a matter of commercial practice it may not always be easy to find steel that satisfies the requirement. Inability to satisfy a clear but demanding standard is different from inability in the first instance to determine what the standard is. We see no reason that Pennsylvania may not err on the side of caution in requiring clear affirmative evidence that steel being used is entirely of United States origin rather than, as appellants would have it, giving the benefit of the doubt to much of the steel that is in commercial use. If appellants wish to sell to public agencies in Pennsylvania, their remedy is to use virgin United States steel or to find some other means of tracing the steel's source.

## V. THE EQUAL PROTECTION CLAUSE CHALLENGE

■ Finally, we find no merit in appellants' claim that the Steel Act violates the equal protection clause. Relying exclusively on *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), appellants contend that "the Steel Act unconstitutionally attempts to protect the United States steel industry by discriminating against foreign competition." Appellants' Brief, at 18. Such a purpose, argue appellants, is illegitimate under the equal protection clause. In *Metropolitan Life* the Supreme Court struck down an Alabama statute that imposed a higher tax rate on nonresident insurance companies than on resident companies. Later in the same term, however, *Metropolitan Life* was sharply limited to its facts in *Northeast Bancorp, Inc. v. Board of Governors*, 472 U.S. 159, 176, 105 S.Ct. 2545, 2554, 86 L.Ed.2d 112 (1985). As the present case does not involve the taxing power and "the Equal Protection Clause permits economic regulation that distinguishes between groups that *are* legitimately different—as local institutions so often are," *id.* at 180, 105 S.Ct. at 2558 (O'Connor, J. concurring), we find no basis for concluding that the Steel Act contravenes the equal protection clause.

## VII. CONCLUSION

For the foregoing reasons, the judgment of the District Court will be affirmed.

---

**21.** Appellants contend that such a listing alone is insufficient to ameliorate the statute's vagueness, pointing out that the same classifications incorporated by the Pennsylvania statute also list "wooden chairs." They similarly object that the statute is unconstitutionally vague because it leaves unclear whether suppliers must certify that United States steel is used in "nuts and bolts holding the system together," Appellants' Brief, at 47. Again, however, by these objections appellants seek the benefits of a vagueness challenge as it might be raised by other parties. Whatever the case with respect to "wooden chairs" and "nuts and bolts," we have no doubt that a manufacturer of "sewage purification equipment" whose product contains several steel components has had sufficient warning that his product is covered by the statute.